STOCKLEY v. CISSNA.

(Circuit Court of Appeals, Sixth Circuit. November 10, 1902.)

No. 1,088.

1. STATE BOUNDARIES—CHANGE OF RIVER CHANNEL BY AVULSION.
     The sudden cutting of a new channel by the Mississippi river in 1876, called "Centennial Cut-Off," across Devil's Elbow Bend, by which several thousand acres of land within the bend, and formerly on the eastern bank of the river, is left on the western bank, in consequence of the river's abandonment of the old channel, did not change the boundary between the states of Tennessee and Arkansas, which remained where it was originally fixed,—in the middle of the abandoned channel.

**2. DEEDS—RECITALS AS EVIDENCE.**

Recitals in a deed of recent origin that the makers are the heirs of a former owner, without circumstances in support, are not evidence against a stranger.

**3. EJECTMENT—TITLE TO SUPPORT ACTION—EVIDENCE.**

Plaintiff in ejectment proved title in one John T., and introduced what purported to be a copy of his will, devising the land to his son W. W. T., and a quitclaim deed recently executed to plaintiff from persons who recited therein that they were all the heirs of W. W. T., deceased. There was no other evidence of his death intestate, that the grantors were his heirs, or that they were ever in possession of the land. Plaintiff also introduced a decree of a chancery court devesting the title of the parties to the suit to the land in controversy, described as belonging to the estate of John T., deceased, and vesting it in a partnership, through which plaintiff claimed by mesne conveyances; but the decree did not show, nor was there any other evidence to show, who were parties to the suit. *Held*, that neither line of proof showed title in plaintiff which would support the action.

**4. ADVERSE POSSESSION—TIME OF COMMENCEMENT—DEED AS EVIDENCE.**

A deed may constitute part of the evidence of possession, as showing its extent or characterizing it; but it raises no presumption that an actual possession, such as will start the statute of limitations to running against an adverse claimant, which the grantee is shown to have had at a later date, commenced at the date of its delivery.

**5. EJECTMENT—TITLE TO SUPPORT ACTION.**

Under the statute of Tennessee (Shannon's Code, §§ 5000, 5001), ejectment cannot be maintained on possessory rights only, although the defendant is a mere trespasser, but the plaintiff must show a perfect legal title, either by deraignment from the state, or by evidence of actual occupation under deeds purporting to convey the title for the full term of seven years.

**6. SUBMERGENCE OF RIPARIAN LANDS—EFFECT OF RELICTION.**

Land bounded by a navigable river, extending to ordinary low-water mark, which is lost by erosion or submergence, is regained to the original owner of the fee when by reliction or accretion the water disappears and the land emerges; and although the erosion or submergence may have extended across the entire tract, and upon the land of an adjoining owner, such owner cannot claim the land upon its reappearance as an accretion to his own; nor has he any claim to accretions beyond the original shore boundary of the submerged tract over the former bed of the river, which inure to the owner of such tract.

**7. ADVERSE POSSESSION—LAND CLAIMED AS ACCRETION.**

A deed conveyed a tract of land by metes and bounds, and also purported to carry the right to accretions consisting of new land formed by the reliction of the Mississippi river. The legal title to such new land was, however, in another, who owned the same before its submergence. *Held*, that the deed constituted, at most, only color of title to such new land, and that possession and occupancy of the principal tract by the grantor or grantee did not constitute actual possession of the new land, which would operate to set the statute of limitations to running as against the legal owner.

**8. ACCRETIONS—EJECTMENT TO RECOVER—TITLE TO SUPPORT.**

Accretions are apportionable among riparian proprietors according to the lateral lines of the firm land owned by them, and a legal title to such land is essential to support an action of ejectment to recover accretions thereto.

**9. EJECTMENT—TITLE TO SUPPORT—GRANT AFTER COMMENCEMENT OF ACTION.**

A grant of land by the state of Tennessee relates back to the date of entry, and is sufficient to support an action of ejectment for the land granted, although such action was commenced before the date of the grant, where the entry was prior to the action.

**10. BOUNDARIES ON NAVIGABLE STREAM — EFFECT OF SUDDEN CHANGE OF CHANNEL.**

Where, by the law of the state, as in Tennessee, lands bounded by a navigable river extend only to ordinary low-water mark, the title to the bed of the river remaining in the state in trust for public uses, land formed gradually by accretion below low-water mark becomes the property of the adjoining owner,—the low-water line remaining his boundary; but, where the stream suddenly abandons its old bed and seeks a new channel, such change works no change of boundary in the lands of adjoining owners, but the title to the land in the abandoned channel remains in the state.

**11. NAVIGABLE RIVER—LAND FORMED BY SUDDEN °CHANGE OF CHANNEL—GRANT BY STATE.**

Acts Tenn. 1847, c. 20, providing for the granting by the state of "vacant lands," does not apply to the bed of the Mississippi river, which many years after the passage of the act became dry land by a sudden change in the course of the river, by cutting a new channel and abandoning the old one,—such land not being vacant land, within the meaning and purpose of the act; and a grant thereof by the land department of the state is unauthorized and void. While the title to such land remains in the state, as before the reliction, it is held for public purposes, and cannot be granted to private persons unless the legislature shall expressly so authorize.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

This is an action of ejectment to recover some 1,200 acres of land described as situated in Tipton county, Tenn. The subject-matter of the suit is land lying substantially between the eastern bank and middle thread of an old and dried-up bed of the Mississippi river. The plaintiff claims the whole of this land, as accretions to land owned by him, originally bounded by the Mississippi river, as well as under a grant from the state of Tennessee to himself for about 1,000 acres thereof, issued in 1901. The declaration sues for the land in controversy as two contiguous tracts, one containing 1,050 acres, or thereabout, and the other 131 acres, more or less. The first or larger tract, which will hereafter be described as the "Island 37 Tract," inasmuch as it is now adjacent to the plaintiff's land on Island 37, is claimed both as an accretion to land on Island 37, and by virtue of the very recent grant from the state of Tennessee mentioned above. The other or smaller tract is now part of Centennial Island, and will be hereafter called "Centennial Island Tract," and is claimed only as an accretion to the plaintiff's land on Centennial Island. The defendant relied upon the general issue of not guilty. After the evidence for both sides had been concluded, the court below instructed the jury to find for the defendant. This instruction has been assigned as error. From the observations made to the jury by the learned trial judge, we are advised that this instruction was predicated upon the supposed invalidity of the grant under which the plaintiff claimed the greater part of the premises, and upon his failure to show a perfect legal title to contiguous lands bounded by the river, to which the parcels in issue were claimed as accretions.

The premises in dispute is a body of new-made land, resulting from a remarkable change in the course of the river by the sudden formation of a new and short channel across the narrow neck of a great bend of the river, known as the "Devil's Elbow," some 30 or 40 miles above Memphis, Tenn. This cut-off channel, now known as the "Centennial Cut," occurred in a single night in March of 1876. The distance by the old channel of the river around the bend was from 15 to 20 miles. The distance across the neck, where the new channel was cut, was somewhat less than 2 miles. The general course of the river in the vicinity of this cut before the new channel was formed is very well shown by a reconnoissance survey made by the war department in 1874, which is set out opposite (Map No. 7).

The deep water channel of the river at the date of this map is shown by the dotted black line. The cut-off of 1876 occurred at the point on the map where the neck of the bend is narrowest, and upon which appears the name of "Massey," a then occupant of part of the land which was washed away by the river. The land claimed on the dry land of Island 37 by the plaintiff is about the point indicated by the name "Mrs. Smith," one of the remote grantors under whom plaintiff claims. The elbow cut off from the eastern shore of the old channel by the Centennial Cut-Off constituted for a time an island, and has ever since been known as "Centennial Island." This island was originally separated from Island 37 by McKenzie's Chute, being the channel mediately after the cut-off in favor of the deeper and shorter channel formed by the Centennial Cut-Off, and shown in the map above, east of Island 37. There was evidence tending to show that the main channel of the river around Island 37, as well as McKenzie's Chute, continued to be navigable for possibly one or two or three years by very small boats after this cut-off, but that both channels were substantially abandoned by navigation immediately after the formation of the new channel, and that since about 1880 both channels have gone substantially dry, except in high water; and that Centennial Island, Island 37, and the Arkansas shores constitute now substantially one body of dry land, capable of being crossed dry shod, except in high water. Much of this new land is now grown up in willows and cottonwoods from 18 inches to 2 feet in diameter, and both of the parties to this litigation claim to have fields now in cultivation within what before the cut-off was the bed of the old river.

An official survey of the river made in 1883–84, under the supervision of the Mississippi river commission, shows the new course of the river through the Centennial Cut-Off. This survey is set out opposite (Chart No. 18).

The outlines of old Island 37 are not shown on this map, as the work done by the commission did not include the surface between the northerly lines of Centennial Island, as bordered on what was McKenzie's Chute and the old Arkansas bank of the river. Island 37 is therefore represented on this map by the blank space between the Arkansas shore line and Centennial Island. But to understand the issues involved, it becomes necessary to show the relation of the riparian lands claimed by the plaintiff at the time when they were granted, and at successive periods between his remote and immediate grantors. All of the lands on both Island 37 and Centennial Island were granted by the state of Tennessee about 1823. For the purpose of showing the course and channel of the river as it is supposed to have existed at the time of the old grants under which he claimed, the plaintiff caused a map to be constructed by Mr. J. H. Humphrey, a local civil engineer, in which the banks of the river, as this engineer supposed them to have existed in 1823, are set down from data obtainable from two sources—First, the government survey and plot of the government lands on the west or Arkansas

Chart No. 18.

shores; second, from the calls and plots of Tennessee surveys and grants of land on the Tennessee side of the then channel of the river. The map, in reduced form, is set out herewith (see Humphrey's map, below).

## Humphrey's Map.

On this map the old banks of the river are represented by black shaded lines, as are also the collateral channels or chutes called "McKenzie's Chute" and "Dean's Chute." The channel now occupied by the river is shown by black lines shaded with blue. The land in dispute is that shown between red lines, though the western lines are not indicated. The Centennial Island tract, of 131 acres, is indicated by the lines marking off a tract of 131 acres on northwest corner of Centennial Island. This is claimed by the plaintiff to have been upland included within the lines of deeds under which he holds his Centennial Island lands, and that it was washed away by the river when its new channel was formed, and has been since restored by accretion. This Centennial Island tract is by the evidence indisputably shown to be included within the boundaries of a 2,000-acre grant to Simon Huddleston. As we shall have occasion to refer to the lines of that grant more than once, we here set them out: "Beginning at a willow marked S. S. Stephen Slade's northeast corner, on the bank of the Mississippi river; thence south with his line one hundred and fourteen chains to a mulberry marked S. H.; thence east two hundred chains to a mulberry marked S. H.; thence north seventy-eight chains to a white oak marked S. H., on the bank of the Mississippi river; thence down said river with its meanders north, 41 degrees west, thirty-five chains, south, 82 degrees west, thirty chains, north, seventy-one west, thirty-two chains, south, 70 degrees west, sixty-two chains; thence north, 72 degrees west, fifty-two chains, to the beginning." This grant bears date January 22, 1824. The eastern 1,500 acres of this tract were conveyed to John Trigg in 1837 by deed duly recorded, and this deed plainly includes the 131-acre tract now in dispute.

The plaintiff claims to deraign title from this John Trigg, and for this purpose introduced the following conveyances:

(1) Will of John Trigg, 1865, giving the east 1,500 acres of Huddleston grant to his son W. W. Trigg.

(2) Quitclaim deed of certain persons claiming to be the widow and only surviving children and heirs of W. W. Trigg to plaintiff, Stockley. This deed is dated March, 1897.

(3) A decree of December 4, 1879, of the Shelby county, Tenn., chancery court, entitled as follows, "T. A. Nelson, Ex., v. M. L. Trigg, et al.," and reciting that "Sledge, McKay & Co., a mercantile partnership," had purchased two certain tracts of land in Tipton county, Tenn., one containing 33.75 acres and the other 305.75 acres, belonging to the estate of John Trigg, deceased, sold under the former decrees of this court, herein described as follows: "Portions of a certain tract of about 1,300 acres of land, situated in Tipton county, Tennessee, which has been surveyed by C. C. Burke, who reports that the Centennial Cut-Off has placed nearly 1,000 acres under the X of the Mississippi river, and which is in range 9, section 5, on said river; the said cut-off leaving 33.75 acres on the main land and 305.75 acres on the island: (a) The tract containing 33.75 acres begins at a stake on the bank of the Mississippi river, thence down said river with its meanders north, 75 degrees west, 16 chains, north, 76½ degrees west, 32 chains, south. 50½ degrees west, 3 chains and 8 links, south, 43 degrees west, 11 chains and 50 links; thence east 56 chains and 80 links to the point of beginning,—all open land," etc. "(b) The tract containing 305.75 acres begins at a stake on the bank of the Mississippi river, on Centennial Cut-Off, at the dividing line between C. A. Stockley's and John Trigg's land; thence north 97 chains and 14 links to a small cottonwood, marked T, on the bank of old river; thence up old river south, 71 degrees east, 11 chains, south, 50 degrees east, 13 chains, south, 40½ degrees east, 12 chains, south, 22 degrees east, 17 chains, south, 10 degrees east, 7 chains and 60 links, south, 9 degrees east, 9 chains, south, 18½ degrees east, 9 chains, south, 7 degrees east, 2 chains, south, 12 degrees east, 6 chains and 44 links, south, 30 degrees east, 6 chains, south, 7½ degrees west, 6 chains, and south, 28½ degrees east, 5 chains and 29 links, south, 3 degrees east, 5 chains and 30 links, to a point of entrance of Centennial Cut-Off; thence down said cut-off north, 86¾ degrees west, 8 chains, south, 83 degrees west, 8 chains, north, 85 degrees west, 9 chains, south, 84¾ degrees west, 11 chains and 60 links, south, 69 degrees west, 5 chains and 13 links, south, 69½ degrees west, 9 chains and 30 links, to the point of begin-

ning, of which there is 175 acres open land and in cultivation, with eight tenant houses, fencing moderately good," etc. The decree then proceeds to devest out of "the parties to this suit" all their right, title, claim, and interest, and vests the same "in the said partnership of Sledge, McKay & Co." No other part of this record is introduced, and there was no evidence as to who were parties to the suit, nor as to who constituted the partnership of Sledge, McKay & Co. These deeds were made in 1883.

(4) Deeds of persons describing themselves as the heirs and executors of Norfleet R. Sledge, Sr., and heirs of Wm. M. Sledge, conveying their interest in settlement of partnership affairs to A. N. McKay, described as surviving partner of the late firm of Sledge, McKay & Co.

(5) Deeds from persons describing themselves as executors and devisees under the will of A. N. McKay, and also as his heirs at law, to Thos. H. Allen, Jr. This is dated January 2, 1888.

(6) Thos. H. Allen, Jr., to plaintiff, W. H. Stockley, January 2, 1888.

The land claimed on Island 37 by the plaintiff is embraced in a single deed from one W. J. Cæsar to him, under date of April 18, 1898. The description is as follows:

"A certain tract, piece, or parcel of land lying, being, and situate on Island No. 37 in the Mississippi river, in said Tipton county, Tennessee, and more particularly described as follows, to wit: Beginning at the northeast corner of a 204½ acre tract in the name of R. H. Byrne, the same being also a corner of a 1,010-acre tract sold by R. I. Chester to L. Speck and John V. Wise; thence north with the line of the same to the northeast corner of same, a stake in the north boundary line of N. Potter's 640 acres, and in the south boundary line of 610 acres in the name of T. P. Hall; thence east in said line 350 poles, more or less, to the northwest corner of entry No. 8, for 152 acres in the name of John Trigg; thence south along west boundary line of said John Trigg's 152 acres to the bank of the Mississippi river; thence down said river as it meanders to the east or upper boundary line of said 204½-acre tract in the name of R. H. Byrne; thence north on said line to the place of beginning.

"It is hereby understood and agreed that at the present time the Mississippi river has changed its course, and does not now touch any of the above described lands, and that where said river is named as a boundary line it is understood to mean where said river once ran, which course of bed is now dry, and known as 'McKenzie's Chute'; and it is further understood and agreed that this conveyance carries with it all accretions now formed or added to said above-described lands. This deed is made and delivered in lieu of the deed heretofore executed by W. J. Cæsar to the grantee herein, covering the same premises, and which was lost or destroyed before its delivery."

The plaintiff's title is connected by several conveyances back to Robt. I. Chester, who in February, 1869, conveyed same to Mrs. Martha P. Smith, who was the owner and occupant at date of the origin of the Centennial Cut-Off, in 1876. The intermediate conveyances between Chester and the plaintiff all contain certain recitals and boundaries identical with those set out above. The deed from Chester omits the paragraph set out above, beginning, "It is hereby understood, etc.," and contains no reference whatever to the fact that the Mississippi river had gone dry, or to any accretions. There was evidence tending to show considerable encroachment of the river upon lands bounded on McKenzie's Chute and lying on Island 37. Just when this washing away occurred, and its extent, was not very clearly shown, though there were some evidences that considerable parts of the small grants shown by the Humphrey plat to lie south of the southern boundary of the 640-acre grant to Potter had been lost by erosion. The evidence also showed very conclusively that the two small grants to J. Trigg, one for 152 acres and one for 37 acres, and shown on the Humphrey plat, had been washed away prior to the cut-off of 1876, except a narrow strip of the 152-acre tract, along which a public county road ran. This remaining strip of the 152-acre tract is shown on the Humphrey map. The evidence shows that at that point the bank was high and firm, and that the high bank bent westward and passed the western line of the. 152-acre tract, and is found then on the eastern end of the plaintiff's

land, a corner of which, shown fairly on the Humphrey map, had likewise been washed away prior to the cut-off of 1876. In this manner a part of the eastern boundary was on the river as it existed at time of the cut-off, although the eastern boundary called for the western line of the Trigg 152-acre tract, and not the river.

### Accretions.

There was evidence tending to show that immediately after, and as a direct consequence of, the Centennial Cut-Off, land began to form all along the eastern border of Island 37, and along the northern and eastern corner of Centennial Island, and that within a few years the entire bed of the river was dry, except during very high water or because of the presence of ponds or sloughs in the deeper holes of the old bed. There was evidence, also, tending to show that, prior to the cut-off, land was forming rapidly on the western shore of Dean's Island, an island on the Arkansas side of the middle thread of the river, and that, as a result of the change in the course of the river at the cut-off of 1876, this formation went on with accelerated rapidity until the land resulting from such accretion united Dean's Island to the southern and northeastern shores of Island 37. There was also evidence tending to show that after the cut-off the river ceased entirely to flow either around Island 37 or through McKenzie's Chute, save in very high water, and that the water at once shallowed, and that shoals and islands appeared in the body of the stream, as well as along both shores, and that the bed of the river became rapidly dry, because the water had ceased to flow between the old banks. Certain it is that the whole bed of the river was substantially dry land within from three to ten years after the cut-off.

G. J. McSpadden, for plaintiff in error.

Caruthers Ewing, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

1. Jurisdiction of the court below: There was the requisite diversity of citizenship, and the jurisdiction of the circuit court was obvious, provided the locus in quo was within the boundaries of the state of Tennessee. When the territory now constituting the state of Tennessee was ceded by the state of North Carolina to the United States, the center of the main channel of the Mississippi river was the boundary separating North Carolina from the Spanish territory west of that river. Moss v. Gibbs, 10 Heisk. 283; treaty of Paris, Sept. 3, 1782; 8 Stat. 81; act admitting Arkansas, June 15, 1836 (5 Sat. 50); Missouri v. Kentucky, 11 Wall. 395, 401, 20 L. Ed. 116. The sudden change in the channel made in 1876, by which the river abandoned its long course around the bend known as the "Devil's Elbow," and cut a new, straight, and short channel across the neck of that bend, did not operate to change the boundary between Tennessee and Arkansas. The new channel was the result of a sudden and uncontrollable change in the direction of the main current of the stream. In cutting the new channel, some 2,000 acres of cultivated river bottom land was washed away in the course of about 60 hours. Within that time a new channel, some 20 to 40 feet deep, in ordinary water, was permanently established; being the channel now know as "Centennial Cut-Off." This channel shortened the distance around the bend some 15 miles. As another direct result, the old channel of the river, so long the boundary between the two states of Tennessee and Arkansas, was completely deserted by the river, and in a short

time became dry land.   Thousands of acres of dry river bottom within the jurisdiction of Tennessee, as land lying on the east side of the main channel of the river, were by this sudden formation of this new channel placed upon the west side of the Mississippi river; and the inhabitants of nearly an entire civil district of Tipton county, one of the counties of Tennessee lying on the Mississippi river, found themselves living on the west, instead of the east, side of the great river.   But this sudden change in the channel of the river did not affect the title to the lands thus transferred from one side of the river to the other, nor did it alter the boundary between the states.   The middle of the main channel which the river abandoned was the boundary before the formation of the cut-off channel, and that line in the dry and abandoned bed of the river remains. the line, unaffected by the new course of the river.

The doctrine is well settled that when lands border on navigable rivers, and the banks are changed by that gradual and imperceptible process known as "accretion," the boundaries of the riparian proprietor still remain the river, although as a consequence of such change in the shore line the area of his possession may change.   A boundary on a river implies a boundary changing as the shore line changes by accretion or erosion, in the absence of definite intention to the contrary.   Posey v. James, 7 Lea, 98; Mayor, etc., of Inhabitants of New Orleans v. U. S., 10 Pet. 662, 717, 9 L. Ed. 573; Jones v. Soulard, 24 How. 41, 16 L. Ed. 604; Banks v. Ogden, 2 Wall. 57, 17 L. Ed. 818; Saulet v. Shepherd, 4 Wall. 502, 18 L. Ed. 442; St. Clair Co. v. Lovingston, 23 Wall. 46, 23 L. Ed. 59; Jefferies v. Land Co., 134 U. S. 178, 10 Sup. Ct. 518, 33 L. Ed. 872; City of St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941; Nebraska v. Iowa, 143 U. S. 359, 367, 12 Sup. Ct. 396, 36 L. Ed. 186. The rule applicable to private riparian titles is likewise applicable to the boundaries of nations situated upon opposite sides of a river.   In Nebraska v. Iowa, cited above, the rule as stated by Vattel was adopted and applied in a disputed boundary between two states.   After stating that every estate bounded by a river enjoys the right of alluvion, Vattel applies the same law to sovereign states, saying:

"As soon as it is established that a river separates two territories, whether it remains common to the inhabitants on each of its banks, or whether each shares half of it, or whether, in short, it belongs entirely to one of them, their rights with respect to the river are noways changed by the alluvion.  If it happens, then, that by a natural effect of the current one of the two territories receives an increase, while the river gains by little and little on the opposite bank, the river remains the natural boundary of the two territories, and each preserves the same rights upon it notwithstanding it is gradually changing its bed; so that, for instance, if it be divided in the middle, between the persons on each bank, that middle, though it changes its place, will continue to be the line of separation between the two neighbors.  The one loses, it is true, while the other gains, but nature alone produces this change.  It destroys the land of the one, while it forms fresh land for the other.  This can be no otherwise determined, since they have taken the river alone for their limits."  Vatt. Law Nat. § 269.

But if the change in the channel of the stream be not gradual and imperceptible, but sudden and violent, so that a new channel is suddenly cut when there had been none before, and the old channel

deserted for the new, there is no change in the boundaries of states or nations bordering on the river. The boundary remains where it had been,—in the middle of the old abandoned main channel of the river. Vatt. Law Nat. § 270; Nebraska v. Iowa, 143 U. S. 359, 367, 12 Sup. Ct. 396, 36 L. Ed. 186; Posey v. James, 7 Lea, 98; Moss v. Gibbs, 10 Heisk. 283.

After fully reviewing the authorities, Mr. Justice Brewer, in Nebraska v. Iowa, cited above, says:

"The result of these authorities puts it beyond doubt that accretion on an ordinary river would leave the boundary between the two states the varying center of the channel, and that avulsion would establish a fixed boundary, to wit, the center of the abandoned channel."

The evidence in this case made it clear that, whatever may be said in respect to the formation of new land within the banks of the old channel, the new channel called "Centennial Cut-Off" was an avulsion. This was the clear admission of both parties upon this question of fact before the court and jury below, and in consequence of which evidence was stopped; having no other purpose than to show the suddenness and violence of the change in the course of the river. As much as 2,000 acres was carried away in the course of about 60 hours, upon which stood farmhouses, stables, cotton gins, warehouses, etc.; and so rapid was the process of washing away the farms through which the river ran as to make it in some cases impossible to remove household effects rapidly enough to avoid the caving banks.

It is clear, whatever the interpretation placed upon the ambiguous judgment relied upon to show that the defendant withdrew his plea to the jurisdiction, that the lands in dispute are on the eastern side of the middle line of the channel of the old river, and therefore within the boundary of the state of Tennessee, although now west of the present channel of the Mississippi river.

2. As to the small parcel of 131 acres: The questions upon which the plaintiff's right to recover this tract depends are not precisely the same as those in respect to the other and larger parcel, though many of the questions are common to both. There was evidence quite satisfactorily establishing the fact that this parcel, while owned by John Trigg, the second grantee in the line of title, was rapidly washed away by the sudden change of the course of the river in 1876, and that it has since been restored by accretion or some other process by which the submerged land has again emerged above the water. The plaintiff claims that this parcel, as plotted on the Humphrey map, was included within the grant of 1824 to Simon Huddleston, and in the deed of Huddleston to John Trigg of the 1,500 acres, forming the eastern end of the Huddleston grant. Speaking of this 131-acre tract, the court below said:

"Wholly on the bank as that was, and wholly above the low-water mark as it was in its original form, the plaintiff would be entitled to recover that 131 acres down to the low-water mark of 1876, when it was hid away by the flood of the cut-off of that year, if he had not failed to show title by deraignment," etc.

Plaintiff did deraign title down to John Trigg, who was in possession of the premises at the time of the flood of 1876. His trouble

is to show how he has acquired the John Trigg title. A paper purporting to be a copy of the will of John Trigg, giving the 1,500 acres of the Huddleston grant owned by him to his son W. W. Trigg, was put in evidence. This operated to put title in W. W. Trigg, if of any effect whatever. How did the title get out of W. W. Trigg? The plaintiff undertook to show this by two lines of proof: First. He put in evidence a deed dated March, 1897, purporting to be made by certain persons describing themselves as being "all the heirs of W. W. Trigg, deceased"; one of the grantors describing herself as his widow, while the others describe themselves as his "only surviving children." This deed describes the property conveyed by the same description as that of the deed from Huddleston to Trigg. Second. He put in evidence a certified copy of a decree purporting to have been made by the chancery court for Shelby county, Tenn., entitled in a cause styled "T. A. Nelson, Ex., v. M. L. Trigg, et al.," devesting the title to certain portions remaining above water after the flood of 1876 of the Trigg 1,500-acre tract of land out of the parties to that suit, and vesting it in a partnership styled Sledge, McKay & Co. The boundaries of the tracts of land thus devested and vested have been heretofore set out. This decree was made December 4, 1879. The next link is a deed conveying the right and title of the grantors as heirs and executors of Norfleet R. Sledge, and as heirs of W. M. Sledge, in the land described in said decree, "in settlement of the partnership affairs of Sledge, McKay & Co.," to A. N. McKay, as the "surviving member of that firm." This deed purports to have been made in 1883, and describes the land as bounded by the chancery decree before mentioned. This is followed by a conveyance made in 1888 to Thos. H. Allen, Jr., by certain persons who describe themselves as executors, devisees, and heirs at law of A. N. McKay. Thos. H. Allen and wife in the same year conveyed to the plaintiff. The last two deeds described the land by metes and bounds, identical with those of the decree of 1879, and for the first time refer to accretions by adding to the description the words "and all accretions thereto." There are a number of difficulties in the title as thus made out. If the will of John Trigg operated to vest the title in W. W. Trigg, which we may assume, it devolved upon the plaintiff to deraign title from W. W. Trigg. This he claims to have done by the production of a deed from persons who describe themselves as the heirs of W. W. Trigg. There was no evidence of either the death of W. W. Trigg, or that the persons claiming to be his surviving children and heirs were in fact his children or heirs. The deed is practically a quitclaim, as it warrants only against persons claiming under the grantors. Being made in March, 1897, it is such a recent instrument as to carry with it no presumption in favor of the authenticity of the recitals as to heirship. That recitals in an ancient deed may be evidence as against persons who are not parties to the deed, and who do not claim under it, may be regarded as well settled. Carver v. Jackson, 4 Pet. 1, 7 L. Ed. 761; Crane v. Morris' Lessee, 6 Pet. 598, 8 L. Ed. 514; Deery v. Gray, 5 Wall. 795, 18 L. Ed. 653; Fulkerson v. Holmes, 117 U. S. 389, 6 Sup. Ct. 780, 29 L. Ed. 915; Hodge v. Palms, 68 Fed. 61, 15 C.

C. A. 220. The fact necessary to be established in order to give effect to this deed is that the persons making it were in fact the children and heirs of W. W. Trigg. The fact was one of pedigree, and this is a fact which may, upon grounds of necessity, be established by hearsay evidence, contrary to the general rule excluding evidence of that character. Now, the makers of this deed recite therein that W. W. Trigg is dead, and that they were his only children and heirs. Undoubtedly they were competent to prove these facts. But the plaintiff, instead of introducing them or other persons acquainted with the family, and proving their relation and the death of W. W. Trigg intestate, insists that the self-serving declaration of the grantors constitute evidence per se sufficient to make at least a prima facie case to go to the jury. We are not aware of any rule which attaches evidential value to recitals of this character in deeds not ancient, unless supported by circumstances tending to establish their authenticity. In Carver v. Astor, 4 Pet. 1, 83, 7 L. Ed. 761, Justice Story, after speaking of the value of a recital in deeds between the parties or their privies as estoppels, said of such a recital:

"It does not bind persons claiming by an adverse title, or persons claiming from the parties by a title anterior to the date of the reciting deed. Such is the general rule. But there are cases in which such a recital may be used as evidence against strangers. If, for instance, there be the recital of a lease in a deed of release, and in a suit against a stranger the title under the release comes in question, this recital of a lease is not per se evidence of the existence of the lease. But if the existence and loss of the lease be established by other evidence, there the recital is admissible as secondary proof, in the absence of more perfect evidence, to establish the contents of the lease; and if the transaction be an ancient one, and the possession has been long held under such release, and is not otherwise to be accounted for, there the recital will of itself, under such circumstances, materially fortify the presumption, from lapse of time and length of possession, of the original existence of the lease. Leases, like other deeds and grants, may be presumed from long possession, which cannot otherwise be explained; and under such circumstances a recital of the fact of such a lease in an old deed is certainly far stronger presumptive proof in favor of such possession under title than the naked presumption arising from a mere unexplained possession."

The rationale of the subject is that unless the recitals, in connection with other circumstances, are such as to raise a natural presumption of the truth of the facts recited, they are not evidence per se. The more ancient the deed, the less the necessity for circumstances in support. Jackson v. Cooley, 8 Johns. 128, is supposed to justify the admission of very recent recitals as evidence per se. But in that case there was evidence tending to support the truth of the recitals of heirship contained in the deed, and these circumstances were held strong enough, with the recitals, to make a prima facie case for the plaintiff. The rule seems to clearly be that recitals in a deed of recent origin that the makers are the heirs of a former owner, without circumstances in support, are not evidence against a stranger. Jones v. Sherman, 56 Miss. 560; Costello v. Burke, 63 Iowa, 361, 19 N. W. 247; Potter v. Washburn, 13 Vt. 558, 37 Am. Dec. 615; Watson v. Gregg, 10 Watts, 289, 36 Am. Dec. 176; Mining Co. v. Irby, 40 Ga. 479.

We do not find that the Tennessee supreme court has ever decided the question here presented. The cases cited from that state are for the most part cases in which the effect of recitals as estoppels between parties and privies, or recitals against interest, or recitals by officials in statutory deeds, were involved. There is nothing in any of the cases in conflict with the rule we have stated, and the reasoning in Wilcox v. Blackwell, 99 Tenn. 352, 41 S. W. 1061, and Henderson v. Galloway, 8 Humph. 692, is in line with the authorities we have cited.

In the case at bar there was no evidence that W. W. Trigg was dead, and none that the grantors in this deed were his children. There was in fact no evidence that these grantors had ever been in possession of any part of the premises conveyed. The deed itself was a quitclaim,—a circumstance not tending to support the claim of title and heirship. There was therefore a chasm in the chain of title through W. W. Trigg. But plaintiff did no better in his effort to deraign title from John Trigg through the judicial sale under decree of the Shelby county chancery court. No part of the record was introduced, except the final decree vesting and devesting title. The decree undertakes to devest title out of "the parties" to the cause, but does not recite who were parties. How are we to know that the heirs and devisees of John Trigg were parties? There is not even a recital that they were, and there is no presumption that they were, arising under the vague and indefinite recitals of the decree put in evidence by the plaintiff. There is no reason in such a case for indulging presumptions in favor of the jurisdiction of the court or the regularity of the proceedings, for there are no recitals in the decree from which we can even guess who were the parties over whom the court claimed to have jurisdiction.

We need go no further, for, if the subsequent links were made out, these chasms were fatal to the effort to deraign title from John Trigg. The plaintiff has failed to show that he has acquired the title of John Trigg, which appears to be the only legal title to either the lands on the bank of the river, or the new-made land included in the 131-acre parcel once submerged, but now restored.

Possessory title: But it has been very earnestly insisted that, if the plaintiff in error has failed to deraign title from John Trigg, he has nevertheless had such possession of the premises in dispute as to entitle him to recover in this action; and he has assigned it as error that the court did not instruct the jury that plaintiff had had such a continuous adverse possession under his deed from Thos. J. Allen, Jr., as vested him with an indefeasible fee-simple title in the lands therein conveyed, including the accretions thereby conveyed.

He has also assigned as error that the court did not submit to the jury, under proper instruction, the question as to whether plaintiff had shown an actual adverse possession for a period of seven years of any part of the land described in the conveyance of Allen to him. We have already called attention to the fact that the plaintiff Stockley's deed from Thos. H. Allen, Jr., conveys two distinct parcels. One is described as a tract of 33 acres and a fraction, and the other as a tract containing, by survey, 305 acres and a fraction. These

tracts are not connected, and the smaller one, with its accretions, is not here involved in any way. The parcel of 131 acres, which is claimed as an accretion, is not included within the specific boundaries described, but is conveyed by Allen, if at all, by operation of the added words, "and all accretions thereto." This 131-acre parcel is not an accretion to the 305-acre tract conveyed by Allen to Stockley, inasmuch as it is but a restoration of a part of the 1,500 acres conveyed by Huddleston to John Trigg, which was washed away as a first effect of the Centennial Cut-Off. But if we regard the conveyance as operating to convey this tract of new-formed land under the description of "all accretions thereto," we are then to inquire whether there was any such conclusive evidence of a continuous adverse possession for the full term of seven years by the plaintiff and those under whom he claims as would justify the court in withholding the question of title by possession from the jury, or, in the alternative, such a conflict of evidence tending to show such a continuous possession as would require the submission of the question to the jury.

There was evidence tending to show that plaintiff was in the actual possession of some part of the tract of 305 acres, and some evidence that he is also in the actual possession of some part of the accretion south of the 131-acre parcel, and south of what is called "Sandy Chute" on the Humphrey map, which accretion is not here involved. There is no evidence that he has now or ever had any actual possession of any part of the 131-acre accretion, other than that constructive possession which results from his possession of other parts of the land included in the Allen deed. We shall assume for the purposes of this case that the plaintiff's possession of the 305-acre parcel was a constructive possession of the 131-acre parcel although the two tracts may be claimed by different titles.

The contention upon this state of facts is that we must presume, and that it would have been the duty of the jury to presume if the case had been submitted to the jury, that this actual possession which is shown to have existed when the defendant entered began at the date of the deed from Allen, which was in January, 1888, and that thus the plaintiff has, through this presumption, shown an actual adverse possession for more than seven years under the deed of Allen, which at least was color of title under the Tennessee statute of limitations, and that by operation of such adverse possession he had at the commencement of this suit, in 1901, an indefeasible fee in all the lands so held by and under an instrument so purporting to convey the fee. Mill. & V. Code Tenn. § 3459; Blantin v. Whitaker, 11 Humph. 313; Belote v. White, 2 Head, 705, 712; Bleidorn v. Mining Co., 89 Tenn. 167, 15 S. W. 737. There is no legal presumption that the plaintiff's actual possession began at the date of his deed from Allen, and there is no evidence from which the jury could reasonably and legally infer that his actual possession began then, or at any other date far enough back to constitute an adverse actual possession for more than seven years before the defendant's entry. To sustain his claim that the law raises a presumption that the plaintiff took actual possession of the land conveyed to him by the deed of Allen,

he cites Lafferty v. Whitesides' Lessee, 1 Swan, 123–128, and Fowler v. Nixon, 7 Heisk. 719, 727. These cases fall far short of sustaining any such contention. A deed or lease may constitute part of the evidence of possession, as showing its extent as well as charterizing it, but there is no authority for the contention that an actual adverse possession such as will start the statute of limitations is presumed from the mere fact that the plaintiff at a particular date took a deed, grant, or lease to the land in question. A title by seven years' adverse possession under a deed purporting to convey the fee requires an actual adverse occupation for the entire period of seven years, and no such evidence of a continuous adverse possession for that period by either the plaintiff or those under whom he claims was shown as to justify or require the submission of the case to the jury on that question.

But the plaintiff insists that, inasmuch as the plaintiff has shown a possession under color of title, which constructively extended to the 131-acre parcel as included within the Allen deed, and inasmuch as the defendant exhibited no paper title whatever, he is entitled to recover, as against the defendant, even though he has not shown a perfect legal title, by deraignment or otherwise. The defendant claims the premises in dispute as accessions or accretions to Dean's Island, upon which he appears to be a riparian proprietor. The land being new-made land, lying between occupants of opposite banks of the old channel of the river, each seems to have advanced claims based upon the law of accretion. True, the defendant has not shown a legal title to the old Arkansas bank. But he has taken actual possession of the res, and thus forced the plaintiff to all the hazards of an action of ejectment. The plaintiff has not chosen to resort to the Tennessee statutory action of unlawful entry. That is an action which tries only the immediate right of possession, and lies whenever there has been actual trespass, resulting in a tortious dispossession. On the contrary he has brought a straight action of ejectment, which in Tennessee is something more than a mere possessory action, inasmuch as the judgment, contrary to common law, is conclusive upon the parties, saving to persons under disability another action within three years after the removal of the disability. Shannon's Code Tenn. §§ 5000, 5001. Whatever may be the right of a plaintiff in other jurisdictions to recover in ejectment upon proof of mere possession at the time of the defendant's entry, in Tennessee the rule is well settled that the plaintiff cannot recover in ejectment unless he shows a perfect legal title, either by deraignment from the state, or by evidence of actual occupation under deeds purporting to convey the title for the full term of seven years. Polk v. Henderson, 9 Yerg. 312; Kimbrough v. Benton, 3 Humph. 129; Campbell v. Campbell, 3 Head, 325; Walker v. Fox, 85 Tenn. 154, 2 S. W. 98; Evans v. Land Co., 92 Tenn. 355, 21 S. W. 670; Hubbard v. Godfrey, 100 Tenn. 150, 156, 161, 47 S. W. 81; Stinson's Lessee v. Russell, 2 Tenn. 40.

The precise question here involved received a full and elaborate reconsideration by Associate Justice McAlister in Hubbard v. Godfrey cited above. A judgment of the chancery court of appeals holding that the complainants might recover, although they had failed to show

a complete legal title or seven years' adverse possession, because the defendant had shown no title in himself and was a trespasser, was reversed, and the rule restated and fortified by a consideration of a long line of Tennessee decisions, constituting a well-settled part of the land law of the state. There was in the suit now under examination no evidence of such long and continuous possession under deeds purporting to convey the disputed premises by the plaintiff and those under whom he claims as to justify the submission of the case to the jury upon the question of a title by adverse possession. A possession for less than seven years, continuous and adverse, would not confer a title upon which ejectment may be maintained. The question is plainly one of local law, and we are constrained to follow the Tennessee rule in respect to the title necessary to maintain ejectment. The case of Sabariego v. Maverick, 124 U. S. 261, 296, et seq., 8 Sup. Ct. 461, 31 L. Ed. 430, is therefore not controlling.

### The Plaintiff's Title to Lands on Island 37.

3. Before the plaintiff can recover the new-formed land on the margin of the solid land composing Island 37, he must be able to establish his ownership of the bank against which the accretion has formed. Until he does this, he has no shadow of claim as a riparian proprietor. The right to accretion depends upon the contiguity of the claimant's estate to the river. Bates v. Railroad Co., 1 Black, 204, 17 L. Ed. 158; Saulet v. Shepherd, 4 Wall. 502, 18 L. Ed. 442; Association v. Shriver, 64 N. J. Law, 550, 46 Atl. 690, 51 L. R. A. 425. Accretion is an addition to riparian land made by the water to which the land is contiguous. Posey v. James, 7 Lea, 98; St. Clair Co. v. Lovingston, 23 Wall. 46, 23 L. Ed. 59. In Tennessee it is well settled that a riparian proprietor of land upon a navigable stream owns only to ordinary low water mark. If the stream be nonnavigable, and his title call for the stream as a boundary, his title extends to the center of the stream. The title to the lands constituting the bed of a navigable stream, in the legal sense, is in the state, which it holds for the benefit of the public. Holbert v. Edens, 5 Lea, 204, 208, 40 Am. Rep. 26; Elder v. Burrus, 6 Humph. 358; Martin v. Nance, 3 Head, 649; Goodwin v. Thompson, 15 Lea, 209, 54 Am. Rep. 410. Conceding for the purposes of this case that the plaintiff has shown a title from the state or by adverse possession to the lands conveyed by the deed of April 18, 1898, from W. J. Cæsar to him, it by no means follows that he has shown either himself or those under whom he claims to have been riparian proprietors. Plaintiff's chain of title goes back to Robt. I. Chester, who in 1869 conveyed the lands now in question to Mrs. Martha P. Smith. While Chester's southern boundary was that branch of the Mississippi river called "McKenzie's Chute," yet his eastern line was the western line of a tract of 152 acres granted to John Trigg, and this Trigg tract lay between Chester's eastern line and the bank of the main channel of the Mississippi river. Mrs. Smith, Chester's vendee, was the owner when the Centennial Cut-Off occurred, and in 1889 we find her conveying the same land conveyed to her by Robt. I. Chester to a grantee in the plain-

tiff's chain of title, in which she conveys the land by the identical calls of the Chester deed, but adding these significant words:

"It is hereby understood and agreed that at the present time the Mississippi river has changed its course and does not now touch any of the above-described lands, and that where said river is named as a boundary line it is understood to mean where said river once ran, which course or bed is now dry and known as 'McKenzie's Chute'; and it is further understood and agreed that this conveyance carries with it all accretions now formed or added to said above-described lands."

The metes and bounds of Chester's deed and of all the intermediate conveyances are identical with those in Cæsar's deed to the plaintiff, already set out in the statement of the case. There was evidence tending to show that prior to the great flood of 1876 the greater part of this John Trigg tract of 152 acres had been washed away. When this occurred does not appear in any such conclusive way as to justify a refusal to let the question go to the jury, if a matter of any importance to the solution of the case. So there was like evidence as to the washing away of another small tract of 37 acres granted to John Trigg, lying south of Trigg's 152-acre grant, and east of the southern part of the tract conveyed by Chester to Mrs. Smith. Both these Trigg tracts have been platted upon the Humphrey map. The evidence tended to show, also, that McKenzie's Chute had encroached greatly upon the lands bordering upon its northern bank prior to 1876. By the partial washing away of the Trigg 152-acre tract, the southeastern corner of Mrs. Martha P. Smith's tract was partially washed away at some time prior to 1876,—date not shown. The plaintiff has in no way deraigned title from John Trigg to either of his small grants lying between the lands granted to his predecessors in title and the main branch of the river east of his eastern line. From all that appears, the title to these parcels which interpose between him and the old bank of the river as it existed when the Trigg grants were issued is outstanding in Trigg's heirs.

The deeds under which plaintiff claims call for the western line of the John Trigg 152-acre grant as plaintiff's eastern line. If the land lying east of Trigg's western line is to be regarded as included within the boundaries of the deed under which plaintiff holds, it is because it is included by the added words of description "This conveyance carries with it all accretions now formed or added to said above described lands." It is plain that these Trigg lands are not accretions to the lands described by metes and bounds, but restorations of the submerged John Trigg lands. But if we regard these words as mere words of description, and operative as a conveyance of the two Trigg parcels, it will, at most, make the deed mere color of title; for neither Cæsar, nor any of his predecessors in title, had acquired the John Trigg title. Nor is there any evidence of any actual possession of any part of the lands included within either of the two grants to John Trigg lying east of the land conveyed by Chester to Mrs. Smith. Possession wholly within the limits of the grant to Potter, or the deed of Chester to Mrs. Smith, would not be a possession operating to set the statute of limitations in motion as against the heirs or assigns of John Trigg, as owner of the 152-

acre and 37-acre parcels. To defeat the outstanding Trigg title, the plaintiff would have to show an adverse possession for the full term of seven years within the boundaries of both these grants. Possession of some part of the John Trigg grant is necessary to oust Trigg or his heirs or assigns, and, until an actual possession of some part of those small grants is shown, there is not shown any such adverse possession as would toll the Trigg title. Smith v. McCall's Heirs, 2 Humph. 163; Stewart v. Harris, 9 Humph. 715; Tilghman v. Baird, 2 Sneed, 196; Boles v. Smith, 1 Tenn. Cas. 149; Mining Co. v. Heck, 15 Lea, 497. The law gives the constructive possession to the legal title, and this constructive possession was not disturbed by a possession not within the boundaries of the grants to Trigg, although within the boundaries of a conflicting title which included the Trigg lands.

As a consequence of the changed course of the river in 1876, these submerged Trigg lands have been restored, through accretion or some other process, and are now dry land. It cannot be pretended that, because the surface of these two bodies of Trigg land was washed off, Trigg lost his title to the land so submerged, beyond recovery. The law is otherwise. Land lost by erosion or submergence is regained to the original owner of the fee when by reliction or accretion the water disappears and the land emerges.

It is said in Sir Matthew Hale's De Jure Maris, republished in 16 Am. Rep.:

"If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or though the marks be defaced, yet, if it, by situation and extent of quantity and bounding on the firm land, the same can be known, though the sea leave this land again, or it be by art or industry, the subject does not so lose his property, and accordingly it was held by Cooke and Foster, M. 7 Jac. C. B., though the inundation continue forty years." "But if it be freely left again by the reflex and recess of the sea, the owner may have his land as before, if he can make it out where and what it was, for he can not lose his propriety of the soil, though it for a time became part of the sea."

In Mulry v. Norton, 100 N. Y. 426, 3 N. E. 581, 53 Am. Rep. 206, a beach was washed away, and afterwards restored. The original owner was held to have regained his own. In that case the court said:

"It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or enables another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner's boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. Land lost by submergence may be regained by reliction, and its disappearance by erosion may be returned by accretion, upon which the ownership temporarily lost will be regained. When portions of the main land have been gradually encroached upon by the ocean, so that navigable channels have been extended thereover, the people, by virtue of their sovereignty over public highways, undoubtedly succeed to the control of such channels, and the ownership of the land under them, in case of its permanent acquisition by the sea. It is equally true, however, that when the water disappears from the land, either by its gradual retirement therefrom, or the elevation of the land by avulsion or accretion, or even the exclusion of the water by artificial means, its proprietorship returns to the original riparian owners. Ang. Tide Waters, 76, 77; Houck, Riv. p. 258. Neither does the lapse of time during which the submergence continues bar the right of such owner

to enter upon the land reclaimed, and assert his proprietorship. Ang. Tide Waters, 77–80, and cases cited."

In City of St. Louis v. Rutz, 138 U. S. 226, 246, 11 Sup. Ct. 337, 34 L. Ed. 941, a question of title to land formed by accretion to the bank of the Mississippi river arose. The plaintiff's land on the eastern shore had been washed away and restored. The court said:

"When land was formed again on the place where the plaintiff's land had been washed away, it became the property of the plaintiff, and, although the land thus newly formed, extended a short distance into the old bed of the river beyond the former shore line, such additional formation belonged to the plaintiff as a deposit on that part of the bed of the river which was owned by him in fee, and not to the state of Illinois or to any third party. Otherwise the plaintiff would be cut off, without his fault, from the river front and from his riparian rights."

The locality of the Trigg lands is not a matter of dispute. It is therefore a matter of no importance how long they have been submerged.

The heirs of John Trigg, or those to whom he conveyed same, are the beneficiaries of the restoration. Accretions east of the Trigg lands must be accretions to Trigg's title as a riparian proprietor, for he did not lose this benefit because for a time his own lands were submerged or wasted by erosion. The new land forming where his land had been inured to him by virtue of his title to the bed upon which the accretion was deposited. But if the accretion extended beyond his original shore line, it became an addition to his firm land by the slow and imperceptible movement of his boundary calling for the river.

4. Accretions to the 131-acre parcel: Accretions are apportionable among riparian proprietors according to the lateral lines of the firm land possessed by them. 3 Washb. Real Estate, 58; Gould, Waters, §§ 162–165; Inhabitants of Deerfield v. Arms, 17 Pick. 43, 28 Am. Dec. 276; Mulry v. Norton, 100 N. Y. 426, 3 N. E. 581, 53 Am. Rep. 206; City of St. Louis v. Rutz, 138 U. S. 226, 250, 11 Sup. Ct. 337, 34 L. Ed. 941. The plaintiff's right to accretions accruing to the 131-acre tract heretofore considered plainly depends upon establishment of his title to that parcel. This he has failed to do. Consequently he has failed to show any right to recover the accretions between its side lines extended.

5. The grant to plaintiff of 1901: This grant issued in 1901, and after this action had been brought. It was based upon an entry made in April, 1901, just before the action was begun. The grant relates back to the entry, and it is no objection that the grant did not issue prior to the suit, provided the action was after the entry. Bleidorn v. Mining Co., 89 Tenn. 175, 15 S. W. 737; Wood v. Elledge, 11 Heisk. 612. The grant covers the land lying between the middle of the old channel of the river as the river ran before the Centennial Cut-Off and the bank of the river, not as it was in 1823 and 1824, but as plaintiff claims the bank to have been in 1876, just prior to that cut-off, and for an indefinite time prior thereto. It consequently includes the lands covered by the two older grants to John Trigg, containing, respectively, 152 and 37 acres. It does not include the 131-acre tract on Centennial Island, but bounds on that parcel. The

claim of plaintiff now is that if he has not the title to the new-made land described in his declaration, as a riparian proprietor, the title was in the state of Tennessee, and has been granted regularly and lawfully to him. Under the well-settled law of Tennessee, the soil below low-water mark of the navigable rivers of that state, as well as the use of the stream for purposes of navigation, belongs to the public, and the title is vested in the state for the use of the public. Goodwin v. Thompson, 15 Lea, 209, 54 Am. Rep. 410; Elder v. Burrus, 6 Humph. 358; Martin v. Nance, 3 Head, 649; Stuart v. Clark's Lessee, 2 Swan, 10, 58 Am. Dec. 49; Posey v. James, 7 Lea, 98. Under this rule of property, applicable in this case, the title of John Trigg extended only to low-water mark, and the title to the submerged land under the water and below low-water mark remained in the state for the use of the public. The land previously granted to Trigg, having been regained by accretion or otherwise,—having again become dry land,—was land regained, and was not subject to grant, as the state had parted with its title. Curle v. Barrel, 2 Sneed, 66. Plaintiff's grant is therefore void as to the land previously granted to John Trigg on the bank of Island 37, and can by no reasonable suggestion be valid for any land except that which lays between low-water mark of 1824 and the middle of the old channel of the river. This strip between the two lines mentioned was, prior to the flood of 1876, submerged land, and constituted the bed of the main channel of the Mississippi river. Although the titles of owners of land bounded by the Mississippi river extended only to low-water mark, under the well-settled law of Tennessee, yet, as we have already seen, low-water mark is an indeterminate and movable line; and if, by imperceptible additions made by the river to the shore, the area of firm land is insensibly extended, such additions are nevertheless included within the boundary of the grant or deed calling for the river as one of its boundaries. City of New Orleans v. U. S., 6 Pet. 662, 717, 9 L. Ed. 573; Jefferies v. Land Co., 134 U. S. 178, 188, 10 Sup. Ct. 518, 33 L. Ed. 872; Nebraska v. Iowa, 143 U. S. 359, 361, 12 Sup. Ct. 396, 36 L. Ed. 186.

In Jefferies v. Land Co., cited above, the rule was thus stated:

"Where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary; and a deed describing the lot by number or name conveys the land up to such shifting water line, exactly as it does up to the fixed side lines; so that, as long as the doctrine of accretion applies, the water line, no matter how much it may shift, if named as the boundary, continues to be the boundary, and a deed of the lot carries all the land up to the water line."

This is also the law in Tennessee, and was applied in respect to accretions annexed to land bounded by low-water mark on the Mississippi river. Posey v. James, 7 Lea, 98. The question as to whether the title of a riparian proprietor extends only to high-water or low-water mark, or to the center of the stream, is a question to be settled by the local law, as a rule of property. Barney v. Keokuk, 91 U. S. 324, 328, 24 L. Ed. 224; City of St. Louis v. Rutz, 138 U. S. 226, 242, 11 Sup. Ct. 337, 34 L. Ed. 941.

It must follow from these principles that if the plaintiff's contention that the lands included in his grant, and lying between low-

119 F.—53

water mark and the center of the river as it ran prior to 1876, is an accretion made against the bank of the river on Island 37 and Centennial Island, such accretion would constitute, when formed, an addition to the riparian titles, against which it has been built up, and within the boundaries of the grants to John Trigg on Island 37 and the grant to Huddleston on what is now called "Centennial Island." If this is the case, the state had no title to grant, for, as in Posey v. James, already cited, the accretions constituted an addition to the earlier grants calling for the river as a boundary. But it is also a well-settled rule of law that, if a river should suddenly change its course and abandon its original channel, the boundary line of lands bordering on the stream, and extending only to low-water mark, remain as they were before the desertion of the original channel. City of St. Louis v. Rutz, 138 U. S. 226, 245, 11 Sup. Ct. 337, 34 L. Ed. 941; Nebraska v. Iowa, 143 U. S. 359, 12 Sup. Ct. 396, 36 L. Ed. 186.

In the case last cited, the court, after stating the effect of an insensible growth by accretion to be that the owner of the shore to which the gradual addition is made shall still hold the added soil by the same boundary, said:

"It is equally well settled that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary, and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion. In Gould, Waters, § 159, it is said: 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates.' Murry v. Sermon, 8 N. C. 56; Hagan v. Campbell, 8 Port. 9, 33 Am. Dec. 267; Academy v. Dickinson, 9 Cush. 544; Ang. Water Courses, §§ 57–59; Warren v. Chambers, 25 Ark. 120, 91 Am. Dec. 538, 4 Am. Rep. 23; 2 Bl. Comm. side page 262; Gould, Waters, §§ 158, 159."

If, then, the fact was that the bed of the old stream was suddenly deserted, so as to constitute a case of reliction, rather than the formation of land by the slow processes of accretion, the riparian owners would not profit, for the title to the land so suddenly become dry by the stream deserting its old bed would continue in the state, in such jurisdictions as hold that the title to the submerged beds of navigable streams is in the state in trust for the public. In the latter event the learned trial court expressed the opinion that, under the Tennessee law providing for the granting and entering of the vacant lands belonging to the state, this deserted river bed was not open for entry and grant, and that the grant of November 26, 1901, to the plaintiff by the state, was invalid. The law under which the grant in question issued is chapter 20 of the act of 1847 (Whitney's Tennessee Land Laws, 303). The question as to whether the law of the state providing for the granting of "vacant lands" applies to the bed of a great navigable river, suddenly exposed by a change in the course of the river, depends upon whether such new-made dry land resulting from recession is "vacant land," within the meaning and policy of the land law of the state. In Goodwin v. Thompson, 15 Lea, 209, 54 Am. Rep. 410, it was held that the title to the soil under the waters of streams

navigable in a legal sense could not be acquired by individuals under the general land laws of the state, and a grant which expressly covered the bed of the French Broad river was held void. The opinion of the court was by Associate Justice Cooper,—a very able and discriminating judge,—and is founded upon a consideration of the policy of the state. In conclusion, the learned judge said:

"We think that the public use of our navigable rivers imperatively requires that the soil under the water should be in the state in trust for the public, that the title to the soil under such streams was not intended to be secured by individuals under our general land laws, and that any person setting up a claim thereto must be able to show an express legislative grant."

The case, in its general meaning, is in accord with Morris v. U. S., 174 U. S. 196, 19 Sup. Ct. 649, 43 L. Ed. 946, and State v. Pacific Guano Co., 26 S. C. 50.

But it is said that, even if the sale and disposition of the soil below low-water mark on the navigable rivers of the state was not contemplated by chapter 20 of the Tennessee act of 1847, if at the time the grant to plaintiff was issued the waters had so far withdrawn from the old bed of the river as to permit occupancy and cultivation they were thereby brought within the scope and meaning of the law providing for the sale of the ordinary vacant lands belonging to the state. To support this proposition, plaintiff's attorneys cite Tatum v. Sawyer, 9 N. C. 226; Hatfield v. Grimstead, 29 N. C. 139; and Allegheny City v. Reed, 24 Pa. 39.

Tatum v. Sawyer involved a grant to a salt marsh, made in 1819. The contention was that the grant was void because it was not land, within the meaning of the North Carolina act of 1717, providing for the granting of the vacant lands of the state. It was shown "that the whole marsh on which the plaintiff's grant lies has formed gradually since the year 1802, up to which time it was a sandy beach, always covered at flood tide and dry at ebb." In the court below it was, among other things, insisted that the premises were not subject to the entry laws, "as it was not land when the act of 1717 regulating entries was enacted." The trial judge held the grant valid. The supreme court affirmed the case, saying upon this point only this:

"Lands covered by navigable waters are not subject to entry under the entry law of 1777. It is the legitimate object of a particular description in a grant to designate with more certainty and precision what the parties suppose to be vague and ambiguous in the general one; and therefore, wherever the particular description restrains the general one to natural boundaries, upon those boundaries being shown, the general description is confined to them."

In Hatfield v. Grimstead the grant covered a shallow salt marsh or shoal. "These shoals," said the court, "were not fit for any purpose, save that of hunting grounds for wild fowls that resort there in large numbers to feed on the water grass and moss." The court held that it was subject to entry at the common law, because there was no regular ebb and flow of the tide in Currituck Sound since the closing of the inlet, and that the provisions of the entry acts of the state directing how lands should be surveyed, or navigable waters which might have forbidden such an entry, were not in force at the date of the entry

in question, and that "while those provisions were dormant the common law was alone in force."

Allegheny City v. Reed, cited above, turned alone upon the provisions of the Pennsylvania statutes describing the character of islands which were subject to entry; the court holding that the character of the island sought to be entered was to be ascertained at the time of the entry, and that, if the conditions prescribed then existed, the island was subject to entry. The question of whether subject to entry or not was by the statute made to turn upon whether the island had a soil subject to cultivation.

None of these cases deal with the case of a sudden and extraordinary recession of the waters of a navigable stream, exposing the bed of the river as a consequence of the adoption of a new channel, which is the case now under consideration. The well-settled law, as declared by the supreme court of the United States, is that the ownership of and dominion over lands covered by the navigable rivers and lakes of the United States within the limits of the several states belong to the several states within which they are found, and that if a state, having such title and dominion, see fit to dispose of the title to private persons, it may do so, subject only to the paramount interest of the public in such waters, and of congress to control their navigation. Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018; Morris v. U. S., 174 U. S. 196, 236, 19 Sup. Ct. 649, 43 L. Ed. 946; Scranton v. Wheeler, 6 C. C. A. 585, 57 Fed. 803. Nevertheless it is now settled that, although congress has the power to grant lands below high-water mark of any navigable river within the limits of any territory of the United States, the policy of the United States has been not to do so, and that the general laws should not be construed as extending any grant below high-water mark, in the absence of an affirmative statute, and that grants by the United States of public lands within a territory, though bordering on a river or lake, convey, of their own force, no title or right below high-water mark. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331. In Manns v. Land Co., 153 U. S. 273, 14 Sup. Ct. 820, 38 L. Ed. 714, it was held that land scrip issued by the United States, to be located on any unoccupied and unappropriated lands, could not be located on lands covered and uncovered by the ebb and flow of the tide. In the same case it was held that the words "public lands," in the general legislation touching the disposition of vacant lands, should not be construed as applicable to such tidewater lands.

Morris v. U. S., 174 U. S. 196, 19 Sup. Ct. 649, 43 L. Ed. 946, is a case much more clearly in point than any to which our attention has been called. The locus in quo there involved was a part of the raised lands known as the "Reclaimed Flats," lying along the bank of the Potomac river in front of the city of Washington. The land at the time of the cession of the District of Columbia to the United States was a part of the bed of the Potomac river. The title to the submerged lands constituting the bed of the river was, under the royal charter and laws of Maryland, in the state of Maryland at the date of the cession; and this title passed to the United States at the time of

cession, as well as the Maryland title to all other vacant domain of the state within the ceded district. The acts of the state of Maryland for securing titles to vacant lands were continued in force by a resolution of the congress passed in 1839, and the secretary of the treasury, through the general land office, was required to execute them by issuing warrants and receiving pay for same according to the law of Maryland, and to complete the sale of such vacant lands under the law of Maryland in force at date of cession by issuance of patents in usual form of such patents. In 1869 one Kidwell procured a patent under this resolution for a tract of 57 acres lying in the Potomac river, and known as "Kidwell's Meadows." The contention of the United States was that this patent issued without authority of law, and was null and void. This claim was mainly rested upon the proposition that the land covered by the patent was exempted from the operation of the resolution of 1839, because the land was at the time of cession and at date of said resolution subject to overflow by the tides. In reference to this the court held: First, that the resolution of congress should be construed as applying only to such vacant lands, "for securing title to which the laws of Maryland which were in force in 1801 had made provision," but which were inoperative after the cession for want of appropriate officers and authority within the District for their execution; second, that by the terms of description in the Maryland acts these laws were intended to apply to lands susceptible of some cultivation, and that they did not contemplate a disposition of any lands covered by tide water, the natural and primary use of which was public in its nature, for highways of navigation and commerce. It was claimed, however, that, the waters having receded from the meadows in question, the reasons for exemption from the operation of the resolution of congress had ceased. To this the court replied, saying:

"It cannot, we think, be successfully claimed that even if, in 1839, the lands embraced within the Kidwell patent were exempted from the jurisdiction of the land office, yet they were brought within that jurisdiction by the fact that the waters had so far receded in 1869 as to permit some sort of possession and occupancy. Not having been within the meaning of the resolution of 1839, they would not be brought within it by a subsequent change of physical condition, but a further declaration by congress of a desire to open them to private ownership would be necessary. Besides, the facts of the case show that congress is asserting title and dominion over these lands for public purposes. Whether congress should exercise its power over these reserved lands by dredging, and thus restoring navigation and fishery, or by reclaiming them from the waters for wharfing purposes, or to convert them into public parks, or by subjecting them to sale, could only be determined by congress, and not by the functionaries of the land office. If, then, there was an entire want of authority in the land office to grant these lands held for public purposes, a patent so inadvertently issued, under a mistaken notion of the law, would plainly be void, and afford no defense to those claiming under it as against the demands of the government."

The locus in quo presents circumstances of a character quite as unusual as any which appeared in the case of Morris v. U. S. The lands included in the grant were at the time of the enactment of the law under which the grant was issued plainly and clearly not within the terms of the law. They were not unoccupied "vacant lands," within the meaning of the Tennessee act, as determined by the highest court of that state. They have since become dry land, capable of

occupation by a most extraordinary natural phenomenon,—the sudden abandonment by a great river of its natural channel for a new and shorter one. The situation is one which could not have been reasonably contemplated by the lawmaker, when providing for the ordinary vacant lands belonging to the public domain. The lands in question were not at the date of the act of 1847 within the meaning and purview of the makers of the law, because it was the policy and purpose of the state to reserve for the public use the beds of such navigable rivers. Who shall say that, because by a sudden recession of the waters, the lands thus exposed are no longer to be reserved for public purposes? Non constat but that the river may be turned back, by congress or the state, into its old channel, or the old channel dredged so that it will continue to be a highway of commerce. Is the state to be prohibited from converting such a body of land into a highway or public park?

Not having been within the meaning of the Tennessee acts which provided for the disposition of the unoccupied and ungranted land of the state at the time these acts were passed, the locus in quo had not been brought within the terms of these acts by the subsequent extraordinary physical change which has occurred. The dry river bed is public property, held by the state for public purposes, but some further legislation by the state is necessary before such a property will become open to private ownership. There was no such state of evidence as would justify the court in instructing the jury that the premises included in the grant below low-water mark of 1824 was an addition by accretion to the lands granted prior thereto and bounded by the river, or that the change which had occurred had been so sudden as not to be regarded as an accretion. But in either case the grant was ineffectual to give title to the plaintiff. There was therefore no error in an instruction to find against the plaintiff.

Judgment is accordingly affirmed.

## On Rehearing.

### (February 3, 1903.)

The petition to rehear has been carefully considered, and must be denied. The questions raised by it chiefly concern the correctness of the result reached as regards that part of the land in controversy claimed as accretions formed against what was the eastern bank of Island No. 37. Plaintiff claimed said new-formed land under two distinct lines of title: First, as an accretion to the tract of land on Island 37 conveyed in 1869 by Robert I. Chester to Mrs. Martha P. Smith, and to plaintiff by sundry mesne conveyances, the last being from W. J. Caesar; second, under a grant from the state of Tennessee.

We did not support the instruction of the court below upon any theory that this new-made land was not formed by the slow and gradual process called "accretion," but upon the ground that, whether accretions or not, the plaintiff in error could not recover in an action of ejectment without showing either that he was a riparian proprietor against whose lands the locus in quo had formed or that he held a legal title derived from some other source. The conclusion we reached was

that the plaintiff had not shown title to such accretions by reason of riparian ownership, nor any title derived from any other source, and that the instruction to find for the defendant was therefore not erroneous. This conclusion was reached upon the construction of the title papers introduced by the plaintiff, including the Humphrey survey and plots of the old grants on Island 37, and upon the undisputed physical facts necessary to the interpretation of the title papers. Manifestly, the question of title, not turning upon conflicting evidence, was a question of law for the court below. If the plaintiff failed to show such a legal title as would support an action of ejectment, it was the duty of the court to instruct for the defendant; for it was a matter of no concern to the plaintiff whether the locus in quo was the property of the heirs of John Trigg, Mrs. Martha P. Smith, or of the defendant. If the plaintiff had failed to show title in himself, his case broke down, and that was an end of it. It was an inadvertence in our former opinion to say that the title to the two John Trigg grants was outstanding "in the heirs of John Trigg." It was not necessary to say more than that the title was not in the plaintiff, and that we did find as a result of the proper interpretation of the deeds under which the plaintiff holds his land on Island 37. In a later part of the same opinion we referred to the title to the Trigg grants as being in the heirs of John Trigg "or his assigns."

The original contention, vigorously supported by the briefs of plaintiff's counsel, was that the wasting away of the Trigg lands operated as a complete destruction of that title, and that plaintiff's land thereby became riparian, and entitled to all accretions thereafter formed, although made on the site of the submerged Trigg lands. It was further contended that, as the accretions here involved had been made long before Mrs. Smith conveyed her Chester land, thus become riparian, to S. M. Jarvis, through whom plaintiff claims, with a clause conveying all accretions to the land described, this accretion clause operated to pass the locus in quo, because it was an accretion to the land conveyed. This contention we did not accept. Upon the contrary, we held that the accretions in question were not accretions to the Chester land conveyed by Mrs. Smith, but accretions inuring to the benefit of the owners of the two Trigg grants. It is as unnecessary now as when we wrote our opinion to decide whether Mrs. Martha P. Smith had acquired the title to the two Trigg grants before she made her mortgage to S. M. Jarvis in 1889. If she did not convey the lands covered by those grants, it in no way assists the plaintiff.

The plaintiff's contention now is that if Mrs. Martha P. Smith in fact owned the two Trigg tracts when she made the mortgage to Jarvis, under whom the plaintiff remotely claims, that effect should be given to that fact in applying that clause of her deed which recites that it is "understood and agreed that this conveyance carries with it all accretions now formed or sodded to said above-described lands," and that we should hold that she intended to convey her Trigg lands and the accretions thereto under the description of "accretion now formed and sodded to said above-described lands." Now, the land described in her deed was a tract of land conveyed to her in 1869 by Robert I. Chester, and being for the most part the land shown on

the Humphrey map as the Potter 640-acre tract. Chester described his eastern boundary as the western line of the John Trigg 152-acre grant, also shown on the Humphrey map. The call of his deed was to run south with the western line of Trigg to the Tennessee river, thence with the meanders of the Tennessee river to the eastern line of the Byrne 204½-acre tract, and with that line to the beginning. The only material difference in the description of the land conveyed to Mrs. Smith by Chester in 1869 and that conveyed by her to Jarvis in 1889 is that, after describing the land as described in Chester's deed, she added a clause in these words:

"It is hereby understood and agreed that at the present time the Mississippi river has changed its course, and does not now touch any of the above-described lands, and that where said river is named as a boundary line it is understood to mean where said river once ran, which course or bed is now dry, and known as 'McKenzie's Chute'; and it is further understood and agreed that this conveyance carries with it all accretions now formed or sodded to said above-described lands."

Now, "the above-described lands" confessedly do not include by description these two Trigg tracts. Upon the contrary she necessarily excludes these Trigg lands by her specific call for a corner in the western line of the Trigg 152-acre tract, a corner standing on a part of that tract which had never been washed away, and by making the western line of that grant the eastern line of the land conveyed. Having thus deliberately excluded the locus in quo by this call for the western line of the Trigg 152-acre tract, it is now insisted that she subsequently included the same by the description of "lands now formed or sodded to the above-described lands." The improbability that she intended any such thing is further indicated by the fact that, when she made this deed to Jarvis in 1889, these Trigg lands had been for 10 years or more high and dry land, and were claimed by her under a distinct deed, made long after her deed from Chester, describing them by specific metes and bounds.

The only argument advanced now in support of the construction claimed for her accretion clause is that there is no other new-made land to which the term "accretion," used in her deed, can be applied, and that, in order to give some effect to that clause, we should construe it as operating to convey the locus in quo to Jarvis, although it did not answer the description of an accretion added to the lands specifically described and conveyed. But this is an unfounded assumption. If her deed to Jarvis be construed, as the brief for a rehearing contends, as bounding the land described and conveyed on the east and south by what is called the "high bank of 1876," meaning the river bank as it was at the flood of 1876, she will exclude the whole southeastern corner of the Potter 640-acre tract; for that high bank is shown to have bent westwardly from a point only 32 poles south of the northwest corner of the Trigg 152-acre tract. This interpretation would also exclude the land inside of the Potter grant which is occupied by the bed of what is called "old river," and shown on the Humphrey map, as well as lying south of that channel as defined and plotted by plaintiff's witness Humphrey. Now, all thus excluded was plainly included in Chester's deed to her, and, if Jarvis was to get all of the land which she got from Chester, he got the part restored by accre-

tion only as an accretion to that specifically described. That the bed of the so-called "old river" had filled up so as to be dry, tillable land, save in times of high water, is the claim and contention of plaintiff. If, therefore, we are right in saying that the accretion upon the site of the Trigg grants inured to the owner of those grants, the accretion made upon the washed-away parts of the land conveyed by Chester to Mrs. Smith inured to the benefit of her title, and passed as accretions to her grantee, being literally accretions to the lands described in her deed.

But, if the third call in Mrs. Smith's deed to Jarvis be extended to the old channel of McKenzie's Chute, as shown on the Humphrey map, in accordance with the explanation she makes in her deed as to what she meant by calling for McKenzie's Chute, the case is no better. That chute was one of the main channels of the Mississippi river, and is now dry land. Now, if accretions have formed against the old shore of Island 37 as a result of the cut-off of 1876, such accretions would follow the title of the shore against which they formed. In this event the made land which shall prove to be an accretion to that described by the deed, which calls to follow the meanders of the river to the eastern or upper line of the Byrne tract of 204½ acres, would pass under her accretion clause to Jarvis, her grantee. There is in no event any reason for stretching the meaning of her accretion clause, to cover lands otherwise plainly excluded, merely for the purpose of giving some effect to that clause. If it be said that in fact the new-made land in the bed of McKenzie's Chute is not an accretion to the shore of Island 37, but to the opposite bank, there would still be no greater reason for applying the accretion clause to the new-made land on her eastern boundary, than upon her southern, and the deed should be construed as applicable only to such accretions as were in law and fact accretions to the land described, if it should turn out that there was any such accretion. The case is not one where we can reform her deed. It must stand as she wrote it.

The other matters touched upon in the petition are mere rearguments of questions once argued and once decided.