No. 13,973.

MRS. MARY E. HUGHES AND HUSBAND vs. THE HEIRS OF BIRNEY ET AL.

SYLLABUS.

1. . It is held that the doctrine of reappearance of land after submergence is the one that controls the case, and that the principles governing the acquisition of land by accretion, or dereliction, are not directly determinative of the controversy, though having a bearing upon the same.

2. If, after submergence, the water disappears from the land, either by gradual retirement, or by the elevation of the land by natural or artificial means, and its identity can be established by reasonable marks, or by situation, extent, quantity, or boundary lines, the proprietorship returns to the original owner.

IN RE. Mary E. Hughes and husband applying for *certiorari,* or writ of Review, to the Court of Appeal, Second Circuit, State of Louisiana.

---

*Wade R. Young,* for Applicants.

---

*Dabney & McCabe, A. L. Slack,* and *William M. Murphy,* for Respondents.

---

The opinion of the court was delivered by

BLANCHARD, J. What is known as DeSoto Point on the Mississippi river in Louisiana was a long, narrow tongue of land, opposite and across the river from the town of Vicksburg in Mississippi.

The river flowed around this tongue in a serpentine course, making a great bend somewhat like an ox-bow, and coming down past Vicksburg, as shown by the appended sketch, taken from a government survey made in the early days.

This tongue of land was included in township 16 north, range 15 east, and was subdivided (presumably at the time of the government survey alluded to) into fractional sections as shown on the first sketch.

The authors of plaintiff's title appear to have acquired Sections 10 and 12 containing, respectively, at the time of the survey, 502.25 and 459.50 acres; and the authors of defendant's title Sections 11, 14, 15 and 18, containing, respectively, 524.14, 94.86, 453.69 and 38.25 acres.

The river, by erosion, in the course of time, encroached upon the upper side of the point, gradually wearing it away until, practically, all of Section 10 had caved into the river and disappeared, and of Sections 11 and 12 all had gone into the river except a narrow strip on the lower side of the point.

There had been little or no change in the river line of Sections 11 and 12 on the east or lower side of the point.

This was the situation at the beginning of the year 1876. In the spring of that year the river broke through the narrow strip of land and made for itself what is called a "cut-off."

It broke through about the center of Section 12, as shown on the second sketch, which roughly delineates DeSoto Point as it appeared in 1876.

The river thus made for itself a new channel and its old bed became "Lake Centennial."

Having made this new channel, it proceeded to widen the same by caving away the land on the south or lower side of the "cut-off." In this way all that remained of Section 12 south of the "cut-off," all of Section 11, not previously lost by the erosion which had taken place on the upper side, probably all of fractional Sections 14 and 18, and the northern portion of Section 15, were washed away. That is to say, the surface of said tracts was washed away; the river went over them; they became submerged.

The tendency of the river was southward. It did not remain in the channel at the "cut-off," where it first went through the strip of land forming DeSoto Point. It seemed to be making an effort to straighten itself at that locality.

Pursuing this object, it wore away all the land south of the "cut-off" to or near the foot of the Point, and then established its permanent channel across the lower portion of the Point, as shown on the second sketch.

Thus was a large part of the center and lower portion of what had

once been DeSoto Point covered by the river, and what remained of that Point above water was (1) the extreme upper or northern part thereof, now become an island, and embracing fractional Section 13 and a narrow strip of Section 12 adjoining Section 13; (2) the ex-

treme lower or southern part thereof, embracing part of Section 9 and the southern two-thirds of Section 15, which now had a front on the river on the west side thereof.

The evidence shows it took the river, approximately, eight months, from the time it made the "cut-off," to erode its way from that point to what was its position in 1898 when this suit was tried in the District Court.

Having established its permanent channel, as shown, across the lower part of DeSoto Point, the river began to fill, with its silt, the stretch of water lying between its channel and the place where it had first broken through the strip of land. This was in point of distance about one mile.

This filling, or deposit, continued until, now, from the "cut-off" to the present channel of the river, there is a solid body of land raised above the water, susceptible in places of habitation and cultivation.

*That land is the subject of controversy in this suit.* It embraces parts of the old bed of the river on both sides, and what was (by the government survey made in 1828) fractional Sections 10 and 11, all of fractional Section 12, except the strip of same left by the "cut-off" on the northeast adjoining Section 13, fractional Sections 14 and 18, and the upper part of Section 15, except that these three fractional Sections last mentioned, or parts of them, and, perhaps, part of what was once Section 10, have supplied in whole or in part, the present permanent channel of the river across the lower portion of the Point, as shown on the second sketch.

The plaintiff claims the whole of this "made" or "raised" land, under Art. 509 of the Civil Code, on the ground that it is an alluvial formation, attached as accretions to that portion of Section 12 on DeSoto Point (now DeSoto Island) which adjoins Section 13, and which remained after the river broke its "cut-off" through there in 1876.

Her suit is petitory in character. From an adverse judgment in the District Court, she prosecuted an appeal to the Court of Appeals, Second Circuit, and being cast there, has obtained a writ of review for its consideration here.

But our conclusions on the facts and the law of the case are no more favorable to her contentions than were those of our brothers of the other courts.

We learn from the testimony that what is now the land in contro-

versy manifested itself as a bar under the surface of the water in about a year after the "cut-off" occurred. The discovery was made by a Cincinnati boat running aground. This was the first intimation or evidence a bar was forming there. By 1879 it was showing up above low water, and continued to rise higher and higher until it became dry land, even when the river was full, from where the "cut-off" had been to the present channel.

It thus appears that that portion of DeSoto Point the surface of which the river cut away when it was forming a new channel for itself has been restored.

The land—the same fractional sections which defendants or their authors owned—is there now. It was a case of temporary submergence. The river went over it and in doing so carried away its surface to about the usual depth of the river at that point. But the river did not remain upon the land. It settled itself in a permanent channel south of it, and then proceeded to uncover the land it had passed over. It did this by its deposits and withdrawal of its waters. Dry land at the same place as before the submergence is there now, susceptible of survey and identification as per the original lines of the government survey. Indeed, it was surveyed under order of court in this very case and the old lines in part run out.

Under these circumstances, we hold that title to the fractional sections which defendants' authors acquired did not pass from defendants by reason of the river going over the land and occupying it for a time.

Ownership of soil carries with it the ownership of all that is directly above and under it. C. C. 505. The ground upon which the river rested temporarily in going over that portion of DeSoto Point never ceased to belong to defendants—the heirs of Birney—and the deposits placed upon it by the river in retiring from it, having been put upon land belonging to them, became likewise their property.

The evidence shows that the deposits first began at the lower end of the land in dispute, near the present channel of the river, and gradually extended up towards Section 12, or what remains of it, at the foot of what is now DeSoto Island. That is to say, the highest part of the restored land is at the lower end, on the east side thereof, and it gets lower as it extends northward and westward.

It is shown that at high stages of water in the river boats may circle, or circumnavigate the land in controversy. The Federal Gov-

670　　SUPREME COURT OF LOUISIANA,

Hughes et al. vs. Heirs of Birney et al.

ernment dredged a canal from the present channel of the river, along the Mississippi shore, to enable boats to reach Vicksburg, and a depression or channel along side of what remains of Section 12, filled with water when the river is high, enables them to pass around the northern end of the restored land and back to the river again through what is called "West Pass" on the west side. At low stages of water, however, these passes around the northern and western sides of the restored land are dry.

It would seem, therefore, that the land in controversy is hardly to be considered as accretions formed to the soil of that portion of Section 12 left above where the "cut-off" had been.

We are of the opinion that the doctrine of reappearance of land after submergence is the one that controls here, and that the principles governing the acquisition of land by accretion, or dereliction, are not directly determinative of the controversy, though having a bearing upon the same.

In Gould on Waters, 2nd Ed., Sec. 158, it is said:—

If navigable waters, owned by the State, suddenly encroach upon private lands adjoining, and there are marks by which their limits can be determined, the title to the soil thus covered remains in the former owner, and upon the recession of the water it is restored as his property.

The author cites many authorities in support of this proposition, among them Sir Mathew Hale's De Jure Maris, Woolaych on Waters, 22, 37, and Mulroy vs. Norton, 100 N. Y. 426 (found also in 53 Am. Rep. 206.)

In the case last referred to it was held that:—

If, after a submergence, the water disappears from the land either by its gradual retirement, or the elevation of the land by natural or artificial means, the proprietorship returns to the original owner. No lapse of time during which the submergence has continued bars the right of the owner to enter upon the land reclaimed and assert his proprietorship when the identity can be established by reasonable marks, or by situation, extent of quantity and boundary on the firm land.

See also Angell on Tide Waters, 1st Ed., 77; St. Louis vs. Rutz, 138 U. S. 226; Nebraska vs. Iowa, 143 U. S. 359.

The true solution of this dispute is to have the old lines of Sections 10, 11, 12, 14, 15 and 18 run out as near as can be on and over the restored land and let plaintiff, Mrs. Hughes, and the defendants, Heirs

of Birney, take such land as may be found within the limits of the Sections owned by them respectively.

It is, therefore, ordered that the judgment of the District Court and that of the Court of Appeals be set aside, and it is now adjudged and decreed that this case be remanded to the District Court in and for the Parish of Madison for further proceedings according to the views herein set forth and the law—costs of all the courts up to this time to be borne by plaintiff; subsequent costs relating to the survey and division of the land to be borne by plaintiff and the heirs of Birney equally.

Rehearing refused.