Stockley v. Cissna.

H. W. STOCKLEY *v.* W. A. CISSNA *et al.*

*(Jackson.* Special September Term, 1907.)

1. **REMOVAL OF CAUSES. By filing certified copy of record in
   the federal court, when.**

   Where the petition, proceedings, and evidence touching the re-
   fused application for the removal of a cause from the State
   court to the federal court were preserved of record by a bill
   of exceptions, the filing of a certified copy of the record, together
   with a good and sufficient bond, in the federal court, operates,
   under the acts of congress and the federal decisions, as a re-
   moval of the cause. (*Post, pp.* 141, 142.)

   Cases cited and approved: Martin v. Railroad, 151 U. S., 675.

2. **SAME. Same. Defendant cannot complain of refusal to grant
   removal where he effected a removal in another way.**

   The defendant cannot, in the supreme court, complain of the
   chancellor's refusal to grant a removal to the federal court,
   where it appears that the defendant had the full benefit of the
   removal in the mode stated in the first headnote, and where
   the federal court remanded the cause back to the State court.
   (*Post, pp.* 141, 142.)

3. **SAME. Action of federal court on removal of cause is conclu-
   sive on State court.**

   The action of the federal court in remanding a cause removed
   from the State court is conclusive on the State supreme court.
   (*Post, pp.* 142, 143.)

4. **CONTINUANCES. Action of trial court not disturbed by
   supreme court, except for great abuse of discretion.**

   It is the established practice of the supreme court not to in-
   terfere with the discretionary action of the trial court on the
   subject of continuance, unless it appears there has been great
   abuse of its discretion. (*Post, p.* 143.)

Stockley v. Cissna.

Cases cited and approved: Rhea v. State, 10 Yerg., 258; Todd v. Wiley, 3 Humph., 576; Womack v. State, 6 Lea, 152; Railroad v. Voss, 109 Tenn., 722; Fox v. State, 111 Tenn., 158.

5. **SAME. Same. Case in judgment.**

The refusal of a second continuance asked by defendant at the June term, 1905, will not be disturbed by the supreme court, where a plea in abatement was filed in January, 1904, and the replication February, 1904, and the defendant obtained a continuance at December term, 1904, and having failed to take proof under the plea, when refused the second continuance. (*Post, pp.* 143, 144.)

6. **RES ADJUDICATA. Judgment in ejectment is not a bar to an action for forcible entry and detainer.**

The action of ejectment is a real action involving the legal title, while the action of forcible entry and detainer is a possessory action involving the right of possession only, and not the legal title, so that the same issues are not involved in both actions, and, therefore, a judgment in the ejectment suit is not a bar to a forcible entry and detainer action, though the parties and the land involved be the same, and though the judgment in ejectment is conclusive, with certain exceptions. (*Post, pp.* 144-152.)

Code cited and construed: Secs. 4970, 5000, 5001, 5103 (S.); secs. 3953, 3983, 3984, 4085 (M. & V.); secs. 3229, 3252, 3253, 3354 (T. & S. and 1858).

Cases cited and approved: *Edwards v. McConnel,* Cooke, 305; Estill v. Taul, 2 Yerg., 467; White v. Suttle, 1 Swan, 174; Elliott v. Lawless, 6 Heisk., 124; Brewster v. Galloway, 4 Lea, 567; Hubbard v. Godfrey, 100 Tenn., 150; Bank v. Smith, 110 Tenn., 337; Borches v. Arbuckle, 111 Tenn., 498; Peyton v. Smith, 5 Pet. (U. S.), 485; Stockley v. Cissna, 119 Fed., 812; 56 C. C. A., 324; Railroad v. Tibbs, 112 La., 51; Riverside Co. v. Townsend, 120 Ill., 16; Fish v. Benson, 71 Cal., 429; Swanson v. Smith, 117 Ky., 116; Fain v. Miles (Ky.), 60 S. W., 939.

7. **STATE BOUNDARIES.** Line between Tennessee and Arkansas was not changed by new channel, called "Centennial Cut-Off," made in 1876.

The boundary line between the States of Tennessee and Arkansas was not changed by the new channel, called "Centennial Cut-Off," which the Mississippi river suddenly and violently cut for itself in 1876, leaving between the old channel and the new channel a large body of land, called "Centennial Island," which boundary remained where it was originally fixed, which is determined to be the middle of the old channel of the said river as it ran in 1823, as shown on the Humphreys' map, appearing on page 155. (*Post, pp.* 152-163.)

Cases cited and approved: State v. Muncie Pulp Co., 119 Tenn., 47; Nebraska v. Iowa, 143 U. S., 359; Missouri v. Nebraska, 196 U. S., 33; Stockley v. Cissna, 119 Fed., 812, 56 C. C. A., 324.

8. **STREAMS.** Actual possession of contiguous shore land does not create constructive possession of land formed by avulsion, so as to authorize action of forcible entry and detainer therefor.

A riparian owner is not entitled to land forming against his land by an avulsion, and hence constructive possession does not attach to such newly formed land by reason of his actual possession of the contiguous shore land, so as to enable him to maintain an action of forcible entry and detainer for the newly formed land. (*Post, pp.* 163-166.)

Case cited and approved: Stockley v. Cissna, 119 Fed., 812, 56 C. C. A., 324.

9. **AVULSION.** Avulsion is none the less so because the old channel does not dry up until ten years elapse.

Where a river suddenly makes for itself a new channel, there is no less an avulsion because the old channel does not immediately dry up, and ten years or more elapse before all the water therein disappear. (*Post, pp.* 165, 166.)

10. **RES ADJUDICATA.** Adjudication in ejectment that grant is void is conclusive in subsequent forcible entry and detainer action, when.

An adjudication in an action of ejectment that a State grant to complainant was void is conclusive between the same parties in a subsequent action of forcible entry and detainer. · (*Post, pp.* 166-170.)

Case cited: Stockley v. Cissna, 119 Fed., 813, 56 C. C. A., 324, and citations.

11. **FORCIBLE ENTRY AND DETAINER.** Cutting timber and grazing stock on part of track will not support this action for other part, when.

The fact that complainant, from time to time, cut timber and grazed stock on a certain part of a tract of land held under an instrument describing the whole tract does not· show such actual possession thereof as will extend the constructive possession to the other part, so as to be sufficient to support an action of forcible entry and detainer for that other part, and especially where the user was not shown to ·be continuous and uninterrupted. (*Post, pp.* 170, 171.)

Cases cited and distinguished: Davidson v. Phillips, 9 Yerg., 93; Brown v. Johnson, 1 Humph., 262; Rutherford v. Franklin, 1 Swan, 322; Hopkins v. Calloway, 3 Sneed, 11; Phillips v. Simpson, 2 Head, 430; Mansfield v. Northcut, 112 Tenn., 536.

12. **SAME.** Possession of part is in law possession of the whole tract so as to support an action of.

The possession of part of a tract of land under an instrument, though merely in the nature of a quitclaim deed, describing the boundaries of the tract, is in law the possession of the whole tract, sufficient to support an action of forcible entry and detainer. (*Post, pp,* 169, 170, 173, 174.)

Cases cited and approved: Brown v. Johnson, 1 Humph., 262; Rutherford v. Franklin, 1 Swan, 322; Mansfield v. Northcut, 112 Tenn., 536.

13. **STREAMS.** Avulsion does not extinguish title, for reappearance of land restores title and right to possession.

The fact that land is swept away by avulsion does not extinguish the owner's title, for, when the land reappears above the water, there is a restoration of title and right to possession. (*Post, pp.* 171-177.)

Cases cited and approved:   Stockley v. Cissna, 119 Fed., 813, 56 C. C. A., 324; Mulry v. Norton, 100 N. Y., 426, and citations.

---

FROM TIPTON.

---

Appeal from the Chancery Court of Tipton County.— JOHN S. COOPER, Chancellor.

G. J. McSPADDEN, for complainant.

CARUTHERS EWING, for defendant Cissna.

R. G. BROWN, for defendant, Muncie Pulp Co.

---

MR. JUSTICE MCALISTER delivered the opinion of the Court.

This is an action of forcible entry and detainer.   The object of the bill is to recover the possession of two tracts of land situated in Tipton county, Tennessee. These tracts adjoin, but are described in the bill separately, for the reason that complainant's title and right of possession to each is derived from a different source.

The smaller of the two tracts comprises about one hundred and thirty-one acres, and is embraced in a tract of two thousand acres originally granted in the year 1824 by the State of Tennessee to Simon Huddleston. The larger tract, comprising about 1,050 acres, adjoins the smaller tract on the north, and was originally granted by the State of Tennessee to John Trigg. The bill alleged that while complainant was in the quiet and peaceable possession of the two tracts of land, fully described in the bill by metes and bounds, the defendants had ousted him from possession, and had cut and removed from the land timber to the value of $20,000, as he is informed and believes. Complainant prayed to be restored to the possession of the land and for a decree against the defendants for the value of the timber appropriated. On the hearing the chancellor pronounced a decree in favor of complainant, adjudging him entitled to the possession of the land in controversy, and ordering a reference to ascertain the amount of timber cut and removed from the land, and to ascertain the value thereof. The chancellor permitted the defendants to appeal from said decree, and the cause is now before this court, mainly on the assignments of error on behalf of the defendant W. A. Cissna.

We shall first notice the error assigned on the refusal of the chancellor to order a removal of the cause on the petition of the defendant to the circuit court of the United States for the western division of the western district of Tennessee. The bill was filed June 10, 1903,

and publication ordered for the nonresident defendants to make their appearance in the cause on or before the first Monday in August, 1903, and make defense to the bill. The regular terms of court convened on the first Mondays in June and December. It thus appears that the first term of the court after the bill was filed was held on the first Monday in December; but, as already seen, the publication for the nonresident defendants required them to enter appearance on a rule day in August, 1903. It appears that on October 17, 1903, the defendants filed their petition for a removal of the cause, and a proper bond was tendered with the petition. On November 17, 1903, complainant filed a motion to dismiss the petition for removal to the United States court on the ground that it was filed after the time defendants had the right to file it under the act of congress. It thus appears that the ground upon which the petition for removal was denied was that it was filed unseasonably. Thereupon, on the 19th day of December, 1903, defendants applied for leave to file an amended petition for removal, which was disallowed by the court. The petition, proceedings, and evidence touching the application for the removal were preserved of record by a bill of exceptions. Defendant Cissna assigns the following exceptions to the action of the court in refusing his petition for removal:

"(1) Said petition was filed in time.

"(2) The petition as amended, and which the court declined to allow to be filed, was filed after an amend-

ment of the bill was made which made the suit an action in ejectment, and therefore the defendants were entitled to a removal.

"(3) No motion was made to dismiss, because the petition was not filed in time."

We find, however, that an examination of these questions is unnecessary, since the record shows that as a matter of fact the cause was removed to the United States circuit court, and by that court remanded to the State court. It appears from the record that, after the refusal of the chancellor to order a removal, counsel procured from the clerk and master a certified copy of the record, and filed it, together with a good and sufficient bond, in the United States circuit court at Memphis. This action operated, under the act of congress and the federal decisions, as a removal of the cause. It further appears that counsel for complainant appeared in the federal court and moved to remand the cause to the chancery court of Tipton county. After argument of counsel and consideration by the court, the cause was ordered to be remanded to the chancery court of Tipton county, which was accordingly done on the 7th day of April, 1905. We think it very plain that the defendants had the full benefit of their petition for removal by the course adopted in filing a certified copy of the record in the United States court. *Martin* v. *Baltimore & Ohio R. R.*, 151 U. S., 675, 14 Sup. Ct., 533, 38 L. Ed., 311.

The action of the United States circuit court on the

removal of the cause is, of course, final and conclusive on this court.

It is also assigned as error that the chancellor refused to grant defendants' application for a continuance at the June term, 1905.   It appears that the plea in abatement filed on behalf of defendant Cissna averred that the lands in controversy were situated in the State of Arkansas, and not in the State of Tennessee.   Complainant joined issue on the plea in abatement.   It appears that at the June term, 1904, the cause was continued by consent until the next December term of the court.   The cause was again continued at the December term, 1904, to the June term, 1905, when it was called for hearing on the plea in abatement.   Counsel for defendant thereupon made application for a continuance, supported by affidavit.   It is the established practice of this court not to interfere with the discretionary action of the trial court on the subject of continuance, unless it appears there has been great abuse of its discretion.   *Womack* v. *State,* 6 Lea, 152; *Todd* v. *Wiley,* 3 Humph., 576; *Rhea* v. *State, 10* Yerg., *258; Fox* v. *State, 111* Tenn., *158, 76* S. W., 815; *Railroad* v. *Voss,* 109 Tenn., 722, 72 S. W., 983.

It appears that the plea in abatement was filed January 16, 1904, and the replication on February 22, 1904. The burden of proof to sustain this plea, of course, devolved upon the defendant, and under the rules of chancery practice four months were allowed defendants in which to take their proof, and the complainant was

entitled to two months thereafter in which to take his
proof. At the December term, 1904, defendants had
not taken their proof, and when the cause was called
a continuance was asked, which was supported by af-
fidavit. Continuance was allowed by the chancellor.
At the June term, 1905, defendants had still failed to
take their proof in support of the plea in abatement,
and again requested a continuance. The court over-
ruled the application, and, in view of the facts already
stated, we are unable to perceive wherein the chan-
cellor was guilty of an abuse of the discretion allow-
ed him in such matters. The chancellor then, at the
June term, 1905, proceeded to hear this plea in abate-
ment, and overruled the same, adjudging that the lands
in controversy were not in the State of Arkansas, but
were situated in the State of Tennessee. At the same
term, to wit: on June 20, 1905, the defendants filed
their answer, in which they denied all the material
allegations of the bill. Defendants embodied in their
answer a plea of *res adjudicata,* averring the present ac-
tion to be barred by the suit of *H. W. Stockley* v. *W. A.
Cissna,* tried and determined in the United States cir-
cuit court.

We shall first consider the defendants' assignment
of error on the action of the chancellor in overruling
the plea of *res adjudicata.* That plea averred that the
present suit was barred by a decree pronounced by the
United States circuit court for the western division
of the State of Tennessee, and affirmed on writ of error

by the circuit court of appeals (119 Fed., 812, 56 C. C. A., 324), which was a litigation between the same parties and about the same subject-matter, wherein the decree was in favor of the defendant Cissna, and complainant's bill was dismissed. The suit instituted by complainant, Stockley, in the circuit court of the United States, was in ejectment, and for the purpose of establishing title to and recovering the possession of the same lands now in controversy. We find in the record a stipulation of counsel in which it is agreed that H. W. Stockley, the complainant herein, was the complainant in the federal court suit, and that W. A. Cissna, one of the defendants herein, was the W. A. Cissna who was the defendant in the federal court case, and it is further agreed that the lands mentioned and described in the declaration in said suit are the same lands that are mentioned and described in the original bill filed in this cause. The distinctive feature between the two suits lies in the fact that the original suit in the United States court was in ejectment, while the present suit is an action of forcible entry and detainer. It is stated on the brief of counsel for appellant that on the 17th day of November, 1903, an amendment was made in the chancery court of Tipton county, which made this case a suit in ejectment, as well as one for forcible entry and unlawful detainer. In this statement counsel is in error. It is true a written motion for leave to amend the bill was filed on November 17, 1903; but the court did not

119 Tenn—10

meet until Monday, December 7, 1903, twenty days thereafter. When the court convened this motion was not presented, and no order or decree was pronounced upon it. No leave was ever given complainant to amend his bill, and as a matter of fact it was not amended, so as to convert it into an action of ejectment. The motion originally filed November 17, 1903, was waived by the complainant, and the action still remained one for a forcible entry and detainer, as commenced by that bill. It is said the records show that the complainant in the case at bar relies entirely upon the same muniments of title as relied upon by him in the federal court, and that complainant has not acquired any title subsequent to the determination of that case. It is then argued that, not only by statute, but by general law, the decision of the federal court is *res adjudicata* and a good defense to the present action. The section of the Code invoked is Shannon's Code, section 5000, relating to a judgment in ejectment, as follows:

"Any such judgment is conclusive upon the party against whom it is recovered, not under disability at the time of the recovery, and all persons claiming under him by title accruing after the commencement of the action."

It may be conceded that a judgment in ejectment under the section of the Code quoted, as well as under well-recognized rules of law, is binding upon all parties to the action and their privies in all cases where the title is the subject of litigation; but the question remains

whether a judgment in ejectment against the complainant forever settles the question of the complainant's right of possession to said land.  It is argued that this must be so because in ejectment both the title and the right to immediate possession are material issues. Shannon's Code, section 4970, provides as follows:

"Any person having a valid subsisting legal interest in real property and right to the immediate possession thereof may recover the same by an action of ejectment."

It is said the same possession and the same expulsion alleged and relied on in the action of ejectment are relied on in the present action of forcible entry and detainer; that in the first action plaintiff sought to recover the land, and in order to do so it was necessary that he should show a legal title and right of possession; whereas, in the present action, he must have the right to immediate possession, but need not establish a legal title.   It is said the right to immediate possession was a material fact determined by the judgment in the first case, and cannot again be litigated.  The question of right to an immediate possession, it is true, was present in the ejectment suit, and it is insisted was concluded by the judgment therein.   In 24 Am. & Eng. Ency. of Law (2d Ed.), p. 780, it was said:

"From these illustrations it will appear that it is not the identity of the thing sued for or of the cause of action which determines the conclusiveness of a former judgment upon a subsequent action, but merely the

identity of the issue involved in the two suits. If an issue presented in a subsequent suit between the same parties or their privies is shown to have been determined in a former one, the cause is *res adjudicata,* although the actions are based on different grounds, or tried on different theories, or are instituted for different purposes and seek different relief. The test of identity is found in the inquiry whether the same evidence will support both actions."

Applying these tests: (1) Was the issue involved in the two suits identical? (2) Did the same evidence support both actions?

In the original suit a very elaborate and learned opinion was delivered by Circuit Judge Lurton in the circuit court of appeals, and is reported in 119 Fed., 812, 56 C. C. A., 324. It appears from the opinion that the suit was in ejectment to establish title to the tracts of land in controversy, and attention was called to the distinctive attributes of the two actions—that in ejectment, and that in forcible entry and detainer. The complainant failed in that action because of defective links in his chain of title, and because he did not show a perfect legal title. It was insisted, nevertheless, that complainant had such possession of the land in dispute as to entitle him to recover in that action. In respect to this contention, Judge Lurton said:

"The plaintiff has not chosen to resort to the Tennessee statutory action of unlawful entry. That is an action which tries only the immediate right of possession,

Stockley v. Cissna.

and lies whenever there has been an actual trespass resulting in a tortious dispossession.  On the contrary, he has brought a straight action of ejectment, which in Tennessee is something more than a mere possessory action, inasmuch as the judgment, contrary to common law, is conclusive on the parties, saving to persons under disability another action three years after the removal of the disability.  Shannon's Code, sections 5000, 5001. Whatever may be the right of the plaintiff in other jurisdictions to recover in ejectment upon proof of mere possession at the time of defendant's entry, in Tennessee the rule is well settled that the plaintiff cannot recover in ejectment unless he shows a perfect legal title, either by deraignment from the State or by evidence of actual occupation under deeds purporting to convey the title for the full term of seven years"—citing *Hubbard* v. *Godfrey,* 100 Tenn., 150, 47 S. W., 81, and many other cases.

It thus appears from the opinion of Judge Lurton that the original action was not one of forcible entry and detainer, but an action of ejectment purely, to try the question of title.  It was expressly held that complainant was not entitled to recover in that action upon proof merely of the right to possession.  It was held by this court in *Borches* v. *Arbuckle,* 111 Tenn., 498, 78 S. W., 266:

"That, where the judgment is silent upon a point, the opinion of the court may be looked to, in connection with the decree or judgment, for the purpose of determining

what was really decided by the court and intended to be adjudged."

When we look to the opinion of Judge Lurton, we find the United States circuit court of appeals expressly declined to determine the question of possession in that action.    In this connection we think the language of the supreme court of Louisiana in *Vicksburg, S. & R. R. Co.* v. *Tibbs*, 112 La., 51, 36 South., 223, very apposite:

"Whatever force there may be in the general proposition that a judgment as to the ownership of a portion of the tract of land is conclusive between the same parties claiming under the same title as to the ownership of the whole tract, the fact remains that a final judgment in a particular case is the law of that case; and when such judgment in terms declares that one title is at issue, and another is not, it cannot constitute *res adjudicata* as to the title held to be not at issue."

It thus appears that the judgment of the court in which the original suit was tried is conclusive as to what issues, rights, or titles were therein involved and adjudicated.    The rule is firmly settled in Tennessee that ejectment is a real action, and, in order to entitle the plaintiff to recover, he must prove a valid and legal title to the land in controversy.    *Hubbard* v. *Godfrey,* 100 Tenn., 150, 47 S. W., 81.

It is equally well settled that the action of forcible entry and detainer is a possessory action, wherein the right of possession only is involved, and the legal title cannot be determined.    Shannon's Code, section 5103;

*Elliott* v. *Lawless,* 6 Heisk., 124; *White* v. *Suttle,* 1 Swan, 174.

Hence it is impossible that the same issues are involved in both actions, and there is no room for the application of a judgment by estoppel, whether the original judgment be found upon the one or the other of the two actions.

The adjudication, to be conclusive, should be upon the very point brought directly in issue by the pleading. *Edwards* v. *McConnel,* Cooke, 305; *Brewster* v. *Galloway,* 4 Lea, 567; *Bank* v. *Smith,* 110 Tenn., 337, 75 S. W., 1065; *Estill* v. *Taul,* 2 Yerg., 467, 24 Am. Dec., 498.

The original suit of *Stockley* v. *Cissna* obviously involved the title to the property, while the present suit only involves the right of possession.    It thus appears that the issues presented in the two actions are entirely dissimilar.    Under the Code, in order to maintain ejectment, it was necessary, not only to show a legal title, but a right to the immediate possession of the land.    Failing to show a legal title, the right of action must inevitably fail, although a right of possession might have been established.    In the action of forcible entry and detainer, if the right of possession is established, plaintiff is entitled to a recovery, and he is not required to show a legal title.    In *Riverside Co.* v. *Townshend,* 120 Ill., 16, 9 N. E., 65, the court said:

"But a judgment in an action of forcible entry and detainer cannot be treated as a bar to an action of ejectment, for the reason that the questions involved in the

two proceedings are different. The object of the action in ejectment is to try the title to property, while in an action of forcible entry and detainer the immediate right of possession is all that is involved and title cannot be inquired into for any purpose." *Peyton* v. *Stith,* 5 Peters (U. S.), 485, 8 L. Ed., 200; *Fish* v. *Benson,* 71 Cal., 429, 12 Pac., 454; *Swanson* v. *Smith,* 77 S. W., 700, 117 Ky., 116 (1903); *Fain* v. *Miles* (Ky.), 60 S. W., 939 (1901).

Without further elaboration of this subject, we are of opinion that the action of the chancellor in overruling the plea of *res adjudicata* interposed on behalf of defendant was correct.

Our next inquiry shall be whether the land in controversy is situated within the limits of the State of Tennessee. This question is raised by the plea in abatement, interposed on behalf of defendant Cissna, averring that said lands are situated in the State of Arkansas, and therefore the courts of Tennessee are without jurisdiction to entertain the present action. It may be remarked in the first place that the two tracts of land in controversy, one containing 1,050 acres and the other 131 acres, more or less, constitute a body of new-made land which was formed as the result of an avulsion of the Mississippi river in suddenly forsaking its main channel and cutting a shorter channel across the neck of a bend of the river, known as the "Devil's Elbow," some thirty or forty miles above the city of Memphis. It appears that the distance by the old channel of the river

around the bend was from fifteen to twenty miles, while the distance across the neck by the new channel was less than two miles. This new channel was formed in the space of twenty-four hours in the month of March, 1876, and in commemoration of that event, which occurred in the one hundredth year of American Independence the channel has since been denominated the "Centennial Cut-Off." An island was formed from the eastern shore of the old channel, which is now known as "Centennial Island." The topography of the country, as well as the course of the Mississippi river prior to the Centennial Cut-Off, is accurately illustrated by the map of Maj. J. H. Humphreys, filed in this cause and marked "Exhibit A" to the deposition of J. H. Humphreys.

The old banks of the river, as well as the chutes, called "McKenzie Chute" and "Dean's Chute," are represented on this map by black lines, while the channel now occupied by the river is shown by the blue lines. The lands in controversy are embraced between the red lines. It appears from this map that about the year 1823 the Mississippi river flowed due south and on the east of Dean's Island, which was situated in Arkansas; that it then turned westwardly around Dean's Island, and then northerly, running between Dean's Island on the east and the Huddleston tract on the Tennessee main shore and Island 37 in Tennessee on the west; thence westwardly, around Island 37; thence southwestwardly, west of Island 37 and the Tennessee main shore; thence southwardly; thence eastwardly to within a mile and a half

or two miles of the river east of Huddleston; thence turning southwardly, etc. The record discloses that the course of the river and the immediate vicinity of country remained substantially in this situation until March 7, 1876, when almost within a single night the river abandoned its original channel and excavated a new channel across the east part of the Huddleston tract, extending from northeast to southwest. It appears that about one thousand acres of the Huddleston tract and parts of other tracts belonging to adjacent proprietors were swept away as the result of the avulsion of the river. It is conceded that the new channel of the river lies wholly within the State of Tennessee. Centennial Island and Island 37 lie on the north side of the new channel, which runs between these islands and the main Tennessee shore. The record reveals that steamboats of light draught periodically ran through the old channel for two or three seasons after the cut-off, but this use of the old channel was finally abandoned, principally on account of the snags and drifts that had accumulated. It is shown from the proof that after a few years land began to appear above the water, and finally the two tracts of land which are now in controversy were fully disclosed, whether as the result of accretion, or emergence of land that had been temporarily submerged, it is not necessary now to inquire. In *Stockley* v. *Cissna*, 119 Fed., 812, 56 C. C. A., 324, the present complainant, W. H. Stockley, in an action of ejectment against the present defendant Cissna, asserted title to these lands

Stockley  v.  Cissna.

**Humphrey's Map.**

upon two contentions:     First, as accretions to land
owned by him and originally bounded by the Mississippi
river; second, under a grant from the State of Tennes-
see for about one thousand acres thereof issued in 1901.
Complainant failed to establish title to either tract of
land, and as the result of that litigation his bill was
dismissed.   Complainant brings the present action in
forcible entry and detainer to recover possession of the
same lands.   The first contention of complainant is
that the lands in controversy are accretions to land
owned by him on Island 37 and Centennial Island.
Complainant makes an additional claim to the right of
possession of the 131-acre tract upon the ground that the
legal title to said land was originally vested in him,
and that he lost possession thereof temporarily as the
result of the avulsion of the Mississippi river.   His
claim now is that, said submerged lands having been re-
stored by the reliction of the waters from the bed of the
abandoned channel, his original ownership and right
of possession have thereby been restored to him.   It is
not claimed by complainant, Stockley, that the lands
in controversy were fenced or in cultivation by him at
the time of the ouster by the defendant Cissna, but his
insistence is that he is entitled to the possession of this
land for two reasons:   First, each of the two tracts now
in litigation, one of 131 acres and the other of 1,050
acres, is part and parcel of another tract which Stockley
had under fence and in cultivation, holding under muni-
ments of title describing the whole property; second,

the two tracts of land described in the bill are accretions to other tracts, situated on Island 37 and Centennial Island, which have been in possession of Stockley for many years. On the other hand, the contention of the defendant Cissna is that the land in controversy is, excepting possibly a small fraction, an accretion to Dean's Island. It is conceded that defendant Cissna is the owner of Dean's Island, on the Arkansas shore immediately opposite Centennial Island. In a word, his insistence is that the land in controversy belongs to him as an accretion to Dean's Island, which has been extended since the Centennial Cut-Off entirely across the river until it joins the Tennessee bank. The insistence on behalf of Cissna is that the lands in suit are wholly situated in the State of Arkansas. It is admitted that he does not claim any land situated in the State of Tennessee. This is a sufficient statement of the case to decide the question propounded in the plea of abatement, interposed on behalf of defendant Cissna, to the effect that the courts of Tennessee are without jurisdiction for the reason the subject-matter of the controversy lies wholly within the State of Arkansas. The first question suggested is whether the boundary between the two States was affected by the sudden and violent change in the channel of the river. The rule of law on this subject seems well established. In *Missouri* v. *Nebraska*, 196 U. S., 33, 25 Sup. Ct., 157 (49 L. Ed., 372), it appears, from the statement of the case by Mr. Justice Harlan, that:

"Prior to July 5, 1867, the body and channel of the Missouri river were substantially as they had been continuously from the date of the admission of the respective States into the union, only such variations occurring during that entire period as naturally follow in the course of time from one side of the river to the other.    But on the day named, July 5, 1867 (which was after the admission of Nebraska into the union), within twenty-four hours, and during a time of very high water, the river, which had for years passed around what is called 'McKissick's Island,' cut a new channel across and through the narrow neck of land at the west end of island precinct (of which McKissick's Island forms a part), about a half mile wide, making for itself a new channel, and passing through what was admittedly at that time territory of Nebraska.    After that change the river ceased to run around McKissick's Island.    In the course of a few years after the new channel was thus made the old channel dried up and became tillable land, valuable for agricultural purposes, whereby the old bed of the river was vacated about fifteen miles in length.    This change in the bed or channel of the river became fixed and permanent; for at the commencement of this suit it was the same as it was immediately after the change that occurred on the 5th of July, 1867.    The result was that the land between the channel of the river as it was prior to July 5, 1867, and the channel as it was after that date, and is now, was thrown on the east side of the Missouri river,

whereas, prior to that date, it had been on the west side."

The fundamental question in the case was whether the sudden and permanent change in the course and channel of the river, occurring on the 5th day of July, 1867, worked a change in the boundary line between the two States. The syllabus of the case is as follows:

"(1) That accretion is the gradual accumulation by alluvial formation; and, where a boundary river changes its course gradually, the parties on either side hold by the same boundary line—the center of the channel. Avulsion is the sudden and rapid change in the course or channel of the boundary river. It does not work any change in the boundary, which remains as it was—in the center of the old channel, although no water may flow thereon. These principles apply alike, whether rivers be boundaries between private property or between States and nations.

"(2) The boundary line between Missouri and Nebraska in the vicinity of island precinct is the center line of the original channel of the Missouri river as it was before the avulsion of 1867, and in the center line of the channel since that time, although no water is now flowing through the original channel."

In *Nebraska* v. *Iowa,* 143 U. S., 359, 12 Sup. Ct., 396, 36 L. Ed., 186, it was held:

"When grants of land border on running water, and the banks are changed by the gradual process known as accretion, riparian owner's boundary line still remains

the stream; but when the boundary stream suddenly abandons its old bed, and seeks a new course by the process known as 'avulsion,' the boundary remains as it was, in the center of the old channel. And this rule applies to a State, when a river forms all its boundary lines."

In that case Mr. Justice Brewer, after reviewing the cases, said:

"The result of these authorities puts it beyond doubt that accretion on an ordinary river would leave the boundary between two States the varying center of the channel, and that avulsion would establish a fixed boundary, to wit, the center of the abandoned channel."

The opinion concluded as follows:

"It appears, however, from the testimony, that in 1877 the river above Omaha, which had pursued a course in the nature of an ox-bow, suddenly cut through the neck of the bow and made for itself a new channel. This does not come within the law of accretion, but that of avulsion. By this selection of the new channel the boundary was not changed, and it remained as it was prior to the avulsion the center line of the old channel; and that, unless the waters of the river returned to their former bed, became a fixed and unvarying boundary, no matter what might be the changes of the river in its new channel."

In *Stockley* v. *Cissna*, 119 Fed., 812, 56 C. C. A., 324, Judge Lurton said:

"The evidence in this case made it clear that, whatever may be said in respect to the formation of new land within the banks of the old channel, the new channel called 'Centennial Cut-Off' was an avulsion. This was the clear admission of both parties upon this question of fact before the court and jury below, and in consequence of which evidence was stopped, having no other purpose than to show the suddenness and violence of the change in the course of the river. As much as two thousand acres was carried away in the course of about sixty hours, upon which stood farmhouses, stables, cotton gins, warehouses, etc.; and so rapid was the washing away of farms through which the river ran as to make it in some cases impossible to remove household effects rapidly enough to avoid the caving banks."

Again in the course of his opinion Judge Lurton said:

"As another direct result, the old channel of the river so long the boundary between the two States of Tennessee and Arkansas was completely deserted by the river and in a short time became dry land. Thousands of acres of dry river bottom within the jurisdiction of Tennessee as lands lying on the west side of the main channel of the river were by this sudden formation of this new channel placed upon the east side of the Mississippi river, and the inhabitants of nearly an entire civil district of Tipton county, one of the counties of

Tennessee lying on the Mississippi river, found themselves living on the east instead of the west side of the great river.   But this sudden change in the channel of the river would not affect the titles to the lands thus transferred from one side of the river to the other, nor would it alter the boundary between the States.   The middle of the main channel which the river abandoned was the boundary before the formation of the cut-off channel, and that line in the dry and abandoned bed of the river remains the line, unaffected by the new course of the river."

Judge Lurton further said:

"It is clear  .  .  .  that the lands in dispute are on the western side of the middle line of the channel of the old river, and therefore within the boundary of Tennessee, although now east of the present channel of the Mississippi river."

The facts stated by Judge Lurton as constituting the sudden and violent change in the channel of the Mississippi, and bringing it within the rule applicable to an avulsion, also appear in the present record; and the rule of law applied to the facts thus found is in conformity with the established doctrine of the supreme court of the United States on this subject.   The boundary line, therefore, between the States of Arkansas and Tennessee at the *locus in quo* of this controversy, is the middle of the old abandoned bed of the Mississippi river as it existed at the time of the Centennial Cut-Off.   But the exact location of this line has been the

subject of much controversy at the bar upon the conflicting and unsatisfactory evidence presented in the record.   This question, however, was the main issue presented in the case of *State of Tennessee* v. *Muncie Pulp Company and Others* (decided at the present term), *ante,* p. 47, 104 S. W., 437, wherein it was held by the court that the true boundary line between the States is the center of the channel of the Mississippi river as it flowed in the year 1823 and as the boundary line was then established.   It is conceded that boundary line embraces all the land now in suit, and brings it within the jurisdiction of the State of Tennessee.   The line of 1823 is shown on the map of J. H. Humphreys, surveyor, filed in this cause.

The next and determinative inquiry presented on the record is whether, at the date of the alleged ouster by the defendant Cissna, complainant, Stockley, was in peaceable possession of the lands in controversy. We will first consider in this connection complainant's right of possession to the 1,050-acre tract.   Complainant claims this tract of land, first, as an accretion to the tract of land on Island 37 conveyed in 1869 by Robert I. Chester to Mrs. Martha P. Smith, and to complainant by sundry mesne conveyances, the last being from W. J. Caesar; second, under a grant from the State of Tennessee issued to complainant on the 26th of November, 1901.   There is no proof that complainant was in the actual possession of this 1,050-acre-tract at the date of the alleged ouster, or that he had said land fenced

or in cultivation. The claim of complainant is that this tract constitutes an accretion to other lands which the complainant owned and of which he was in actual possession at the date of the ouster, and that this accretion is embraced within the boundaries of his muniments of title. In *Stockley* v. *Cissna,* supra, wherein complainant sought to recover this tract of land in ejectment, Judge Lurton said:

"Before the plaintiff can recover the new-formed land on the margin of the solid land composing Island 37, he must be able to establish his ownership of the bank against which the accretion has formed. Until he does this he has no shadow of claim as riparian proprietor. The right to accretion depends upon the contiguity of the claimant's estate to the river."

The court held that, whether accretions or not, the plaintiff in error could not recover in an action of ejectment without showing either that he was a riparian proprietor against whose lands the *locus in quo* had formed, or that he held a legal title derived from some other source. It was held that the plaintiff had not shown title to such accretions by reason of riparian ownership, nor any title derived from any other source. The complainant, however, insists that, although his title to the main shore land failed in that action, he is nevertheless entitled to recover the possession of the accretions, because he was in possession of the main shore lands contiguous thereto. But a conclusive answer to this position is that the 1,050-acre tract

in controversy was formed in the bed of the river as the result of an avulsion, and not as accreted land.   We have already held that the *locus in quo* of the present controversy and the rights of the litigants must be determined by the law applicable to a technical avulsion, and not to the rule governing accretions.   The claim of complainant is that, in view of the slow recession of the waters, he is entitled to the benefit of accretions that formed during that period.   We think a complete answer to this position is found on the brief of Mr. Caruthers Ewing, in which he says:

"We believe that, as an avulsion does not change property lines or property rights, the effect of an avulsion does not, and it must be true that the recession of the waters from the old channel was the immediate and direct result of the cut-off or avulsion.   We do not think there can be an avulsion which directly results in the abandoned channel of the river becoming gradually dry land, and that accretions could be made to the riparian owner's soil on the said abandoned channel.   If an avulsion leaves property and boundary lines undisturbed, then the property and boundary lines remain exactly at the point at which they were when the avulsion took place.   In Tennessee the riparian owner at the time of the avulsion had no title beyond low-water mark, and if the avulsion left that as the line we do not see how as a result of the avulsion the line can be projected further into the abandoned chan-

nel, however slow the waters may have receded therefrom."

We think this an admirable statement of a sound reason why accretions cannot be claimed by a riparian proprietor as the result of an avulsion. It is conceded that the 1,050-acre tract of land was formed as the result of the Centennial Cut-Off. This land must be, therefore, either accretion or the result of an avulsion. There is no intermediate course. The fact that the old abandoned channel of the river did not immediately dry, but that a period of ten years or more elapsed before all the water was withdrawn and disappeared, would not render the cut-off any less an avulsion. This fact must be present whenever there is a change in the channel of a navigable river. It is impossible that there should be an instantaneous withdrawal of all the water in the channel; but after the avulsion has occurred there are accumulations of water which gradually and imperceptibly disappear.[1] The result of this holding is that, since complainant was not in actual possession of the 1,050-acre tract at the time of the ouster, constructive possession did not attach to said land by reason of complainant's actual possession of contiguous shore land.

The next contention of complainant is that he is entitled to recover the possession of the 1,050-acre tract by virtue of the grant issued to him by the State of Tennessee on the 26th of November, 1901, based on an

[1] This question is more fully discussed in State of Tennessee v. Muncie Pulp Co. (decided at present term), *ante*, p. 47, 104 S. W., 437.

entry made in April of the same year. This grant was one of the muniments of title under which complainant claimed this land in the ejectment suit of *Stockley* v. *Cissna,* 119 Fed., 813, 56 C. C. A., 324. It is conceded that this grant covers by metes and bounds the 1,050-acre tract, but does not include the 131-acre tract on Centennial Island, although it bounds the latter parcel of land. The claim of plaintiff in that litigation was that, if he did not have the title to this land as a riparian owner, the title was in the State of Tennessee, which had been granted regularly and lawfully to him. It was held by the United States circuit court of appeals that:

"Under the well-settled law of Tennessee, the soil below low-water mark of the navigable rivers of that State, as well as the use of the stream for purposes of navigation, belongs to the public, and the title is vested in the State for the use of the public"—citing *Goodwin* v. *Thompson,* 15 Lea, 209, 54 Am. Rep., 410; *Elder* v. *Burrus,* 6 Humph., 358; *Martin* v. *Nance,* 3 Head, 649; *Stuart* v. *Clark's Lessee,* 2 Swan, 10, 58 Am. Dec., 49; *Posey* v. *James,* 7 Lea, 98.

"Under this rule of property, applicable to this case, the title of John Trigg extended only to low-water mark, and the title to the submerged land under the water and below low-water mark remained in the State for the use of the public. The land previously granted to Trigg, having been regained by accretion or otherwise, having again become dry land, was land regained,

and was not subject to grant, as the State had parted with its title. *Curle* v. *Barrel,* 2 Sneed, 66.

"Plaintiff's grant is therefore void as to the land previously granted to John Trigg on the bank of Island 37, and can by no reasonable suggestion convey any land except that which lies between low-water mark of 1824 and the middle of the old channel of the river. This strip between the two lines mentioned was, prior to the flood of 1876, submerged land, and constituted the bed of the main channel of the Mississippi river. . . . If, then, the effect was that the bed of the old stream was suddenly deserted, so as to constitute a case of reliction, rather than the formation of land by the slow processes of accretion, the riparian owners would not profit; for the title to the land so suddenly become dry by the stream deserting its old bed would continue in the State in such jurisdictions as hold that the titles to the submerged bed of navigable streams is in the State in trust for the public. The court held that, under the Tennessee law providing for the granting and entering of vacant lands belonging to the State, this deserted river bed was not open for entry and grant, and that the grant of November 26, 1901, to the plaintiff by the State, was invalid. . . . The lands included in this grant were, at the time of the enactment of the law under which the grant was issued, plainly and clearly not within the terms of the law. They were not unoccupied, vacant lands within the meaning of the Tennessee act, as determined by the highest court of

that State. They have since become dry land, capable of occupation, by a most extraordinary natural phenomenon—the sudden abandonment by a great river of its natural channel for a new and shorter one. The situation is one which could not have been reasonably contemplated by the lawmaker when providing for the ordinary vacant lands belonging to the public domain. The lands in question were not at the date of the act of 1847 within the meaning and purview of the makers of the law, because it was the policy and purpose of the State to reserve for the public use the beds of such navigable rivers. . . . The dry river bed is public property held by the State for public purposes, and some further legislation by the State is necessary before such property will become open to private ownership. There was no such state of evidence as would justify the court instructing the jury that the premises included in the grant below low-water mark of 1824 was an addition by accretion to the lands granted prior thereto and bounded by the river, or that the change which had occurred had been so sudden as not to be regarded as an accretion; but in either case the grant was ineffectual to give title to the plaintiff. There was, therefore, no error in the instruction to find against the plaintiff."

This holding is, of course, conclusive between the parties to the present litigation, who were the real litigants in *Stockley* v. *Cissna;* but it is insisted on behalf of complainant that, notwithstanding the entry and

grant of 1901 may be void, those muniments of title may be looked to as defining the boundaries of the 1,050-acre tract, and that, since complainant at the time of the ouster was in possession of a portion of the 1,050-acre tract, that possession will be extended to the limits of the boundaries defined in the entry and grant of 1901. The proposition is that possession of part of a tract of land under an instrument describing the whole is sufficient to maintain an action of forcible entry and detainer for that not actually in possession.

Counsel cites: *Rutherford* v. *Franklin,* 1 *Swan,* 322; *Brown* v. *Johnson,* 1 Humph., 262; *Mansfield* v. *Northcut,* 112 Tenn., 536, 80 S. W., 437.

In the case last cited it was held that constructive possession of a tract of land under a deed definitely describing its boundaries, connected with actual possession of part of the premises, is sufficient to authorize and maintain an action of unlawful entry and detainer. The court cited and approved *Davidson* v. *Phillips,* 9 Yerg., 93, 30 Am. Dec., 393; *Hopkins* v. *Calloway,* 3 Sneed, 11; *Phillips* v. *Simpson,* 2 Head, 430.

In *Mansfield* v. *Northcut,* supra, it appeared that plaintiffs in an action of unlawful entry and detainer had a deed to the land sought to be recovered definitely describing the boundaries, and claimed to the extent of the boundaries. There was a house on the land, occupied by defendant as tenant of plaintiffs, and the remainder was uninclosed mountain land. A claimant of the land under hostile title built a cabin upon a

different part of the premises and induced the tenant to move into it and attorn to him. It was held that the landlord could not thus, by collusion between his tenant and an adverse claimant, be deprived of his possession, which was of the entire tract, sufficient to maintain his action of forcible entry and detainer. These principles are sound and well-recognized; but we do not find in this record any proof of the actual possession by complainant of any part of the 1,050-acre tract at the time of the ouster by the defendant Cissna. It is conceded by complainant, Stockley, that he had no house or improvements on any part of this tract, nor was he in possession of the same by a tenant. No part of said land was under fence or in a state of cultivation. The entire claim of Stockley to an actual possession is based upon the fact that from time to time he cut timber from this land and used it for the grazing of his stock. It is not even shown that this user was continuous and uninterrupted, and no such actual possession of any part of this land is shown as is contemplated by the law. The claim, therefore, of complainant to the possession of the 1,050-acre tract, must be denied, for all of the reasons stated.

We next proceed to a consideration of the claim of complainant to the right of possession of the 131-acre tract. This tract was also claimed as an accretion to shore lands claimed to be owned by complainant; but since we hold that the law of avulsion, and not the law of accretion, applies to the formation of the land

in controversy, complainant's claim to this tract on this ground must also be denied. As held by the United States circuit court of appeals in *Stockley* v. *Cissna*, supra:

"This 131-acre parcel is not an accretion to the 305-acre tract acquired by Stockley by deed from Allen, inasmuch as it is a restoration of a part of the 1,500 acres conveyed by Huddleston to John Trigg, which was washed away as a first effect of the Centennial Cut-Off."

It appears from the record that this parcel of land, while owned by John Trigg, the second grantee in the deraignment of title, was suddenly swept away by the formation of the new channel in 1876, and that since that time this submerged land has again appeared above the water. It is shown that in the ejectment suit in the United States court plaintiff deraigned title to this tract of 131 acres down to John Trigg, who was in possession of the premises at the date of the avulsion in 1876. The federal court held that complainant had failed to show a divestiture of title to this land out of John Trigg, or otherwise how he had acquired the John Trigg title. But it does appear that John Trigg died about the year 1865, and devised this land to his son, W. W. Trigg, who remained in possession until his death, about the year 1871 or 1872. He left surviving him his wife, one son, and one daughter. It appears the widow and heirs were in possession until after the cut-off. It is shown that by the cut-off about one

thousand acres of the land, including the 131-acre tract, was washed away. After the cut-off the remaining parts of these tracts which were not washed away were sold by decree of the chancery court for the payment of the debts of John Trigg. The firm of Sledge, McKay & Company bought these lands at the chancery sale and went into possession. This firm and their assigns and heirs remained in possession until they sold to T. H. Allen, who in the year 1888 conveyed the lands to complainant, Stockley, who has since that time been in possession; but, as found by the United States circuit court, the parcel of 131 acres which is claimed as an accretion is not included within the specific boundaries described, but is conveyed by Allen, if at all, by operation of the added words, "and accretions thereto." Hence, in the present investigation, the Allen deed may be entirely discarded, since complainant can assert no constructive possession of the 131-acre tract by virtue of that deed. It further appears that in March, 1897, the widow and heirs of W. W. Trigg conveyed their interest in the tract, including the part that had been washed away, to the complainant, Stockley. This deed includes in its description the 131-acre tract in controversy. It is shown in the present record that the parties who joined in that conveyance were wife and heirs at law of W. W. Trigg, deceased. It is not shown that complainant had, at the date of the alleged ouster or at any time, had possession of any part of the 131-acre tract, other than that constructive possession which re-

sults from his possession of other parts of the land included in the deed just mentioned. The deed from the widow and heirs of W. W. Trigg is merely in the nature of a quitclaim deed. Complainant again invokes the rule that possession of part of a tract under an instrument describing the boundaries of the tract is in law the possession of the whole tract. *Rutherford* v. *Franklin,* 1 Swan, 322; *Brown* v. *Johnson,* 1 Humph., 262; *Mansfield* v. *Northcut,* 112 Tenn., 536, 80 S. W., 437.

It was held by the federal court that complainant's deraignment of title from John Trigg failed, and the infirmity in the deraignment was based upon the fact that there was no evidence of either the death of W. W. Trigg or that the grantors were in fact his widow and heirs. As already stated, this defect of evidence has been supplied in the present record. We are of opinion, therefore, that complainant in the present cause has shown a possessory right to the 131-acre tract, since in 1897 he went into possession of more than four hundred acres of the Trigg tract under the deed from W. W. Trigg and others, which in its description included the 131-acre tract. He was, therefore, in constructive possession of the latter tract in 1901, when the defendant Cissna went upon the land and built a fence across it, thus ousting complainant of his possession. It has been suggested, however, that the 131-acre tract was washed away and disappeared at the time of the Centennial Cut-Off. It is true that one thousand acres of the Trigg land, which included the 131 acres, was swept

away by the avulsion of 1876; but this fact does not extinguish the owner's title to said land, for, when it reappeared above the water, there was a restoration of the title and right of possession. On this subject, in the case of *Stockley* v. *Cissna,* supra, Judge Lurton said:

"As a consequence of the changed course of the river in 1876, the submerged Trigg lands have been restored, through accretion or some other process, and are now dry land. It cannot be contended that, because the surface of this land was washed off, Trigg lost his title to said land so submerged, beyond recovery. The law is otherwise. Land lost by erosion or submergence is regained to the original owner, when by reliction or accretion the water disappears and the land emerges."

In *Mulry* v. *Norton,* 100 N. Y., 426, 3 N. E., 581, 53 Am. Rep., 206, it appeared that a beach had been washed away and was afterwards restored. In the midst of its opinion the court said:

"It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner or enables another to acquire it; for the erosion must be accompanied by a transportation of the land beyond the owner's boundaries to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property to be established upon its reliction. Land lost by submergence may be regained by reliction, and its disappearance by erosion may be returned by accretion, upon

which the ownership temporarily lost will be regained. When portions of the main land have been greatly encroached upon by the ocean, so that navigable channels have been extended therefrom, the people by their sovereignty over public highways undoubtedly succeed to the control of such channels and the ownership of the land under them in case of its permanent acquisition by the sea. It is equally true, however, that when the water disappears from the land, either by its gradual retirement therefrom or the elevation of the land by avulsion or accretion, or even the exclusion of the water by artificial means, its proprietorship returns to the original riparian owner." Angell, Tide Waters, 76, 77; Houck's Rivers, 258.

"Neither does the lapse of time, during which the submergence continues, bar the right of such owner to enter upon the land and reclaim and assert his proprietorship." Angell, Tide Waters, 77-80, and cases cited; *Ocean City Ass'n* v. *Shriver,* 64 N. J. Law, 550, 46 Atl., 690, 51 L. R. A., 425; *St. Louis* v. *Rutz,* 138 U. S., 249, 11 Sup. Ct., 337, 34 L. Ed., 941; *Gale* v. *Kinzie,* 80 Ill., 132; *Minton* v. *Steel,* 125 Mo., 181, 28 S. W., 746; *Hughes* v. *Birney,* 107 La., 664, 32 South., 30.

It was held in the federal court case of *Stockley* v. *Cissna* that the heirs of John Trigg, or those to whom he conveyed, are the beneficiaries of the restoration. It thus appears that Stockley's vendors did not lose their title to the site of the land washed away by the Cen-

tennial Cut-Off, but their original boundaries had always been preserved to them; and, when this land was built up by the deposits of the river sediment, they may again assert title and right of possession. For the reasons stated, we are of opinion that, as against defendant Cissna and the other defendants, the complainant is entitled to recover the possession of the 131-acre tract described in the bill; but he is not entitled to any relief as to the 1,050-acre tract.

The cost of the appeal will be divided between the parties.